Rule 23 order filed
December 15, 2010;
Motion to publish granted
January 11, 2011, corrected
January 18, 2011.

NO. 5-09-0238

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellee, | ) Christian County. |
| | ) |
| v. | ) No. 06-CF-63 |
| | ) |
| JOHN L. GRAHAM, JR., | ) Honorable |
| | ) Ronald D. Spears, |
| Defendant-Appellant. | ) Judge, presiding. |

_____

JUSTICE WEXSTTEN delivered the judgment of the court, with opinion.
Justices Goldenhersh and Donovan concurred in the judgment and opinion.

**O P I N I O N**

A Christian County jury found the defendant, John L. Graham, Jr., guilty on six counts of criminal sexual assault (720 ILCS 5/12-13(a)(3) (West 2006)). On appeal, the defendant argues that the trial court erred in refusing to subpoena the victim's mental health records for an *in camera* inspection and in awarding the victim's grandfather restitution for traveling expenses. For the reasons that follow, we affirm.

BACKGROUND

In 1992, the defendant's first wife, Rebecca, gave birth to their only child, S.G. In 1994, the defendant and Rebecca divorced, and Rebecca and S.G. moved to Arkansas. Rebecca subsequently remarried and gave birth to S.G.'s half-sister, Lindsey, who was born a special-needs child (spina bifida). In December 2000, S.G. moved to Mattoon to live with the defendant and his second wife, Monica. Rebecca was apparently unable to "handle" both S.G. and Lindsey, and she sent the defendant a letter indicating that if he did not take custody of S.G., then she was going to give her up for adoption.

1

In 2004, the defendant and Monica separated, and the defendant began committing various acts of sexual penetration with S.G., who was 11 or 12 at the time. The abuse occurred frequently until March 2006, when S.G. reported it to her best friend, Elizabeth. After Elizabeth's mother spoke with S.G. about the allegations, the Department of Children and Family Services (DCFS) was contacted, and after a temporary stay at a foster home, S.G. moved back to Arkansas to live with her grandparents. The record indicates that S.G. has been in counseling ever since.

In May 2006, a Christian County grand jury indicted the defendant on multiple counts of criminal sexual assault. Thereafter, the defendant filed numerous pretrial motions, including a motion for the issuance of a subpoena for the production of S.G.'s mental health records. The defendant's motion for the issuance of a subpoena for the production of S.G.'s mental health records alleged that since 2003, S.G. had "exhibited signs indicative of mental illness." The defendant's motion further alleged that he had recently learned that she had undergone "intensive mental health treatment" and was being "medicated for a mental illness." The motion alleged that S.G.'s "mental condition and current medication" could possibly affect her "ability to accurately recollect matters at issue in this case."

At a subsequent hearing on the motion, the defendant argued that because S.G.'s mental condition could possibly "affect her testimony at trial," he was entitled to have the trial court conduct an *in camera* examination of her mental health records. Noting that S.G.'s mental health records were privileged, the State countered that the defendant had failed to allege any connection between S.G.'s mental health problems and her credibility as a witness. Explaining that after moving back to Arkansas, S.G. had been diagnosed as being bipolar and "suffering from a post[]traumatic stress disorder" (PTSD), the State indicated that S.G.'s mental health problems were the result of the sexual abuse that she had endured while living with the defendant. Noting that there was "no allegation that she was on any ***

2

medications at the time that the offense[s] occurred," the State argued that the medications that S.G. was taking to stabilize her conditions actually worked to "improve her credibility rather than detract from it." The State further asserted that even if the court were inclined to grant the defendant's motion, S.G.'s mental health records were in Arkansas, so they were unlikely to be obtainable with a "mere subpoena."

In response to the State's arguments, defense counsel acknowledged that all he knew was that S.G. had "sought some intensive mental health treatment." Counsel maintained that his "dilemma" was that he needed the requested records to determine the potential relevancy of S.G.'s conditions and medications.

Finding that the defendant had failed to meet his burden of establishing that S.G.'s mental health records were material and relevant, the trial court (the Honorable James Roberts) denied the defendant's motion for the issuance of a subpoena for the production of the records. Noting that child victims of sexual abuse commonly seek remedial counseling and treatment, the court ruled that the mere fact that S.G. was apparently receiving that treatment and the defendant's suggestion that "there might be something in [S.G.'s] records that could be helpful" were not enough to justify the disclosure of the records. The court further ruled, however, that if the defendant became aware that S.G. was suffering from "severe mental health issues" unrelated to the sexual abuse, the defendant could so allege and the court would reconsider his motion.

The defendant subsequently filed a motion to reconsider the denial of his motion for the issuance of a subpoena for the production of S.G.'s mental health records. The motion to reconsider alleged, *inter alia*, that S.G. "had exhibited signs indicative of mental illness before coming into contact with the [d]efendant" and "[t]hat due to the relationship between [S.G.] and the [d]efendant[,] he [was] entitled to inspect [her mental health] records." When the motion to reconsider was later argued, defense counsel again maintained that his

3

"dilemma" was that he needed S.G.'s mental health records to determine the potential relevancy of S.G.'s conditions and medications. Indicating that one of the reasons why S.G. had moved to Illinois to live with the defendant was her "mother's inability to control her," counsel suggested that S.G. might have been treated for "some mental illness that stemmed from before she came into contact with [the defendant]." Counsel also reasserted that the defendant was entitled to examine S.G.'s mental health records because of his status as her father.

Again noting that S.G. had sought treatment for her psychiatric issues after moving back to Arkansas in 2006, the State again argued that the defendant had failed to establish a sufficient nexus between S.G.'s mental health conditions and her credibility as a witness. The State contended that the disclosure of her privileged records was thus unwarranted under the circumstances.

Finding no reason to disturb its prior ruling, the trial court (the Honorable Ronald D. Spears) denied the defendant's motion to reconsider. Noting that there was nothing to indicate that S.G. had undergone anything other than "post[]event psychological counseling," the court suggested that the defendant was essentially asking it to go on a "fishing expedition." Indicating that the "rape counselor privilege" would also apply to the requested records, the court stated that if the defendant knew where S.G.'s mental health records were, he could possibly obtain them in his parental capacity, but the court would still have to review them *in camera* and "rule on them."

In November 2008, the State filed a six-count amended indictment charging the defendant with six specific acts of sexual penetration occurring between July 2004 and March 2006, and in February 2009, the cause proceeded to a jury trial. At the start of the trial, defense counsel filed a motion *in limine* to preclude the State from introducing evidence of S.G.'s "mental state before having any contact with the [d]efendant and at the time of [her]

4

allegations." The motion argued that "any testimony from [S.G.] regarding any treatment since these allegations arose should be prohibited as *** irrelevant." When arguing the motion, defense counsel maintained that because the defendant's requests to discover S.G.'s mental health records had been denied, the State should not be allowed to introduce evidence regarding the treatment that she had received "since the allegations."

The State responded by stating that "by way of anticipatory cross," it was going to bring out that S.G. was on medication for bipolar disorder but that it did not intend to elicit that she had also been diagnosed with PTSD. The State advised that it did not have a psychiatrist or psychologist "lined up" to discuss S.G.'s conditions (see 725 ILCS 5/115-7.2 (West 2008) (allowing for the introduction of evidence regarding a sexual abuse victim's PTSD if offered through the testimony of a qualified expert)) and that it was not going to use the evidence to "try to put on some pony show."

After stating that "counseling that victims receive concerning sexual abuse" are privileged communications, the trial court agreed to allow some "leeway" on the matter, and when the court inquired, defense counsel twice acknowledged that the defendant wanted the jury to hear that S.G. had been diagnosed as being bipolar. The court ultimately ruled that S.G. could testify about her counseling and treatment for her bipolar condition, but noting the absence of a mental health expert and the prejudicial nature of the condition's name, the court directed the State to avoid eliciting any testimony regarding S.G.'s PTSD.

When S.G. subsequently testified, she indicated that she had attempted suicide several times since March 2006 and had been diagnosed with "[b]ipolar and depression." S.G. stated that she took Seroquel and Effexor XR for her conditions and that the medications helped her "mood swings" and "thinking."

When cross-examined, S.G. acknowledged that she had not been taking any medications for her bipolar disorder in March 2006. She further acknowledged that leaving

5

her mother to live with the defendant was a "tough transition" and that she had tried to maintain contact with her mother after moving to Illinois. In March 2006, S.G. was optimistic about possibly spending Easter break with her mother, and she was admittedly upset when she learned that the defendant could not afford the cost of the visit. S.G. testified that she was aware that Monica had a daughter who had once "made some claims of sexual assault against a family member of hers."

On redirect, S.G. denied reporting the abuse because she was mad about not being able to visit her mother, and she indicated that she had no reason "to continue to lie about something [that she had] allegedly started three years ago." S.G. stated that she had reported the abuse because she was "tired" of it, and she testified that she had not been taking medication in March 2006 because she had not been diagnosed with bipolar disorder until after she had moved back to Arkansas.

S.G.'s trial testimony regarding the sexual abuse was corroborated by medical testimony describing the condition of her genitalia when they were examined in April 2006 and evidence that S.G.'s DNA was recovered from a sex toy and a condom found during a search of the apartment where she and the defendant had lived together. The jury also heard testimony that when DCFS interviewed the defendant regarding S.G.'s allegations, he had stated that "other than being a little mouthy," S.G. was "a very good kid" and was "pretty much an honest child." The defendant told DCFS that S.G. was apparently making false accusations against him because she "was mad at him because she didn't get to go down to see her mom *** because he didn't have the finances." The defendant also told DCFS that S.G.'s "family down in Arkansas [had] put her up to saying this stuff." The defendant did not testify at the trial.

Rejecting defense counsel's claims that S.G. was a troubled child who had falsely accused the defendant so that she could move back to Arkansas, the jury convicted the

6

defendant on all counts of the amended indictment. The trial court later imposed a 60-year aggregate sentence on the defendant's convictions, and the present appeal followed.

DISCUSSION

S.G.'s Mental Health Records

Contending that the trial court erred in denying his motion for the issuance of a subpoena for the production of S.G.'s mental health records, the defendant first argues that the trial court "should have issued the subpoena, inspected the records *in camera*, and forwarded to defense counsel any items that were relevant to S.G.'s credibility." The defendant suggests that by failing to do so, the trial court violated his rights under the sixth amendment's confrontation clause (U.S. Const., amend. VI). In response, the State maintains that the trial court did not abuse its discretion in determining that the defendant had failed to adequately demonstrate that the records he requested were material and relevant to S.G.'s credibility.

"Illinois courts have held that evidence of a witness's mental condition is admissible to the extent that it bears on the credibility of the witness's testimony and is thus a permissible area of impeachment." *People v. K.S.*, 387 Ill. App. 3d 570, 573 (2008). "Before such evidence may be introduced, however, its relevance to a witness' [*sic*] credibility must be established." *People v. McMillan*, 239 Ill. App. 3d 467, 487 (1993). "A two-step procedure for discovery of mental health records has been established. First, the defendant must sufficiently show that the requested records are material and relevant to the witness's credibility." *K.S.*, 387 Ill. App. 3d at 573-74. "Once this is done, the records are discoverable but must be examined by the trial court *in camera* if the witness claims or asserts his [or her] statutory privilege." *People v. Harlacher*, 262 Ill. App. 3d 1, 9 (1994).

"The trial court has broad discretion in ruling on issues of relevance and materiality and its determination will not be disturbed absent an abuse of discretion." *People v.*

7

*Williams*, 267 Ill. App. 3d 82, 87 (1994). "A claim that the trial court erred in limiting discovery will be reviewed for an abuse of discretion." *People v. Sutherland*, 223 Ill. 2d 187, 280 (2006).

At the outset, we emphasize that the record indicates that S.G.'s psychiatric issues are an unfortunate yet unsurprising result of the years of sexual abuse that she suffered, and her need for what the trial court described as "post[]event psychological counseling" stemmed from the defendant's criminal conduct. We thus agree with the trial court's observation that the "rape counselor privilege" would seemingly apply to the records in question. See *Harlacher*, 262 Ill. App. 3d at 9. That said, as the State notes on appeal, with respect to the two-step procedure for the discovery of a witness's mental health records, "the bar for meeting the 'material and relevant' test has not been strictly defined." Additionally, a resolution of the inquiry must necessarily be made on a case-by-case basis. See *K.S.*, 387 Ill. App. 3d at 573-76 (holding that an *in camera* inspection of school records containing mental health information of three State eyewitnesses was warranted where the school that the witnesses attended "enrolled students with behavioral and mental problems," one of the witnesses had been "placed into a psychiatric facility for three weeks" following the incident in question, and the records apparently contained statements concerning the incident in question); *Harlacher*, 262 Ill. App. 3d at 9 (holding that the defendant had failed to sufficiently show that the requested records were material and relevant where the evidence before the court established nothing more than that his sex abuse victim had seen a clinical social worker "for some unknown reason" six years before the abuse had allegedly occurred); *People v. Monk*, 174 Ill. App. 3d 528, 531, 533-34 (1988) (finding that the defendant had failed to sufficiently show that his sexual abuse victim's records were material and relevant where the defendant's "sole evidence" was that the victim "had been to a medical doctor and a psychiatrist" and "was hyperactive and was taking Ritalin"); *People v. Walton*, 107 Ill.

8

App. 3d 698, 703-04 (1982) (holding that the defendant failed to establish that his robbery victim's mental health records were relevant where the evidence before the court was that the victim was " 'under [the] medical supervision' " of a county social services center and had "once been a voluntary patient in a mental hospital[] but apparently had successfully completed his treatment there"); *People v. Phipps*, 98 Ill. App. 3d 413, 414-15, 418 (1981) (holding that an *in camera* review of the witnesses' records was warranted where the witnesses were residents of a state mental health facility where the crimes allegedly occurred and the defendant specifically alleged that the requested records "contained mental evaluations, intelligent quotients, [and] statements concerning the truth and veracity of the witnesses"). Nevertheless, in *People v. Foggy*, 121 Ill. 2d 337, 350 (1988), the supreme court held that a defendant seeking the disclosure of privileged communications between a sexual assault victim and her counselor must offer a "reason to believe that the victim's counseling records would provide a source of impeaching material unavailable from other sources," and here, we conclude that the defendant has offered no such reason.

Alleging that since 2003 S.G. had "exhibited signs indicative of mental illness," the defendant sought an *in camera* inspection of S.G.'s mental health records because he had recently learned that she had undergone "intensive mental health treatment" and was being "medicated for a mental illness." After the State explained that S.G.'s need for psychiatric treatment and medication was a consequence of her victimization, the trial court gave the defendant the opportunity to allege that S.G. had mental health issues unrelated to the sexual abuse, but all that he subsequently pleaded was that S.G. "had exhibited signs indicative of mental illness before coming into contact with [him]." Other than stating that Rebecca had some problems controlling S.G., however, the defendant never specified what "signs indicative of mental illness" S.G. had exhibited, nor did he ever allege how they might affect her credibility. He never suggested that S.G. had ever experienced delusions, for instance,

9

nor did he ever suggest that S.G. had ever suffered from a condition that might cause her to pathologically lie. In fact, he told DCFS that "other than being a little mouthy," S.G. was "a very good kid" and was "pretty much an honest child."

Here, none of the information before the trial court gave it reason to believe that S.G.'s mental health records would provide the defense with a source of impeaching information not available from other sources. The State disclosed the nature of S.G.'s treatment and the specific disorders that she was diagnosed as having, and nothing indicates that S.G. has ever been treated for anything other than the trauma that resulted from the defendant's criminal conduct. It has also been observed that because a sexual assault counselor does not investigate a victim's complaint but rather "help[s] the victim understand and resolve her feelings about the event," an *in camera* review of a sex abuse victim's counseling records will "not likely result in the disclosure of any material useful to an accused." *Foggy*, 121 Ill. 2d at 348-49. We note that the defendant raised S.G. for several years, and he, himself, was thus a source of potentially impeaching information regarding her mental condition, beyond that which the State offered. We also note that Illinois law sets forth a procedure by which a parent can "inspect and copy" his or her child's mental health records. 740 ILCS 110/4(a) (West 2008). The defendant also had access to numerous unprivileged statements, concerning the sexual abuse, that S.G. made to other persons, which is also significant. See *People v. Foskey*, 136 Ill. 2d 66, 93 (1990) (noting that the *Foggy* court held that disclosure was not required under the facts of that case "because the defendant failed to show that he knew of specific information that would demonstrate bias or motive to fabricate and because the defendant had access, for purposes of cross-examination, to an array of unprivileged statements made by the complaining witness to other persons following the offense"). Under the circumstances, the trial court did not abuse its discretion in determining that the defendant had failed to satisfactorily establish that the records he requested were material

10

and relevant to S.G.'s credibility. The information before the trial court lacked the substance and specificity needed to justify an *in camera* inspection of S.G.'s mental health records. See *Walton*, 107 Ill. App. 3d at 703-04.

Echoing the "dilemma" argument that he advanced in the trial court, the defendant suggests that his lack of specificity should be excused, because without access to the requested records, it was not possible for him to establish anything more than that what is already known about them. The defendant cites *People v. Dace*, 114 Ill. App. 3d 908 (1983), *aff'd on other grounds*, 104 Ill. 2d 96 (1984), in support of this contention. In *Dace*, in response to the State's claim that the defendant had failed to make the requisite showing that would entitle him to discover the mental health records of the State's key witness against him, the court stated the following:

"In essence, the State urges us to require the defendant to demonstrate the relevance and materiality of information to which he has no access. The record here already indicates that [the State's key witness] was involuntarily committed because she was adjudged dangerous. There is no reasonable method for the defendant to establish any more than what is already known from court records. If the State's argument prevailed, a defendant would be unable to make the proposed showing unless, by some fortuity, the witness was either institutionalized at the time of the offense or trial or, even less likely, a witness voluntarily revealed his mental illness and treatment." *Dace*, 114 Ill. App. 3d at 915.

We note that *Dace* has repeatedly been limited to its facts (see *People v. Plummer*, 318 Ill. App. 3d 268, 280 (2000) (noting, "Unlike the testimony of the witness in *Dace*, [the witness's] testimony was not the only evidence against [the] defendant in the instant case"); *People v. Knight*, 139 Ill. App. 3d 188, 195 (1985) (noting that in *Dace* "it was already established that the witness had been involuntarily committed, thus establishing some

11

threshold basis for a belief that such records would be impeaching"); *People v. Friesland*, 130 Ill. App. 3d 595, 596 (1985) (noting that in *Dace*, the defendant "was able to show that the witness had been involuntarily committed and adjudged dangerous to others" and "the record demonstrated that Dace's conviction was solely dependent on the evidence offered by the accomplice-witness"), *aff'd*, 109 Ill. 2d 369 (1985)), but moreover, in *Foggy*, the supreme court rejected the dissenting justice's "Catch-22" argument, which the *Dace* court seemingly espoused. *Foggy*, 121 Ill. 2d at 349-50, 359-60. The *Foggy* court indicated that to require the disclosure of privileged records in the absence of a demonstrated need would effectively require disclosure "in every case," and the court declined to adopt that rule. *Foggy*, 121 Ill. 2d at 349-50. We therefore find that the defendant's reliance on *Dace* is misplaced. We also perceive a more fundamental obstacle that would ostensibly render the defendant's motion for the issuance of a subpoena for the production of S.G.'s mental health records moot, *i.e.*, the trial court's inability to subpoena the records in the first place.

It is undisputed that S.G.'s mental health records are somewhere in Arkansas, and while the defendant asked the trial court to subpoena the records, he apparently failed to consider the logistics of his request. The trial court's subpoena power does not extend across state lines (see *Vinson v. Allstate*, 144 Ill. 2d 306, 312 (1991); *People v. Thompkins*, 121 Ill. 2d 401, 427 (1988)), so it would follow that any subpoena issued by the trial court to an Arkansas entity would be void for a lack of inherent power (see *In re Estate of Steinfeld*, 158 Ill. 2d 1, 14 (1994); *People v. Wade*, 116 Ill. 2d 1, 5 (1987)). Thus, even if we were inclined to remand this cause to the trial court with directions that it subpoena S.G.'s mental health records for an *in camera* inspection (see *K.S.*, 387 Ill. App. 3d at 576), we would be asking the trial court to do something that it does not have the power to do. We also note that Arkansas law strictly prohibits the disclosure of a juvenile's mental health records, and its limited exceptions require a written request from the juvenile's parents or legal guardians.

12

See *Gilcrease v. State*, 2009 Ark. 298, ___, 318 S.W.3d 70, 82; Ark. Code Ann. §9-27-309(*l*)(4) (2010). Ironically, it thus seems that while the trial court did not have the power to subpoena the records that the defendant wanted it to review, the defendant, himself, could have possibly obtained them.

The trial court did not abuse its discretion in finding that the defendant had failed to sufficiently establish that S.G.'s mental health records were material and relevant to her credibility as a witness. Nothing before the court gave it reason to believe that S.G.'s mental health records related to anything other than the treatment she received for the psychiatric disorders that resulted from the sexual abuse to which she had been subjected or that the records would provide the defense with a source of impeaching information not available from other sources. Moreover, given that the requested records are in a location beyond the trial court's subpoena power, any subpoena issued by the trial court would have been void for a lack of authority.

The Trial Court's Restitution Order

When imposing sentence, the trial court, at the State's request, ordered the defendant to pay S.G.'s grandfather $894.60 in restitution as travel reimbursement (2,982 total miles at 30 cents per mile). The record indicates that S.G.'s grandfather drove S.G. from Arkansas to Illinois and back numerous times during the pendency of the defendant's criminal proceedings and incurred additional expenses driving S.G. to and from an anger management support group that had met eight times at a location approximately 40 miles from their home in Arkansas. On appeal, correctly noting that a restitution order that is not authorized by statute is void and can be challenged as such at any time (see *People v. Fouts*, 319 Ill. App. 3d 550, 552 (2001)), the defendant contends that the trial court's restitution order is void because S.G.'s grandfather is not a "victim" for purposes of the statute that authorizes restitution (730 ILCS 5/5-5-6 (West 2008)). The defendant alternatively suggests that the

13

restitution order should be set aside because the trial court failed to consider his ability to pay restitution and failed to specify, *inter alia*, a payment schedule. See 730 ILCS 5/5-5-6(f) (West 2008).

A reviewing court "should reverse a trial court's restitution order only where the trial court has abused its discretion." *People v. Stites*, 344 Ill. App. 3d 1123, 1125 (2003). However, "[w]hether a judgment is void is a question of law which we review *de novo*." *People v. Hauschild*, 226 Ill. 2d 63, 72 (2007).

A sentencing court is statutorily authorized to assess and order that a defendant pay restitution for "the actual out-of-pocket expenses, losses, damages, and injuries suffered by the victim named in the charge and any other victims who may also have suffered out-of-pocket expenses, losses, damages, and injuries proximately caused by the same criminal conduct of the defendant." 730 ILCS 5/5-5-6(b) (West 2008). For restitution purposes, the term "victim" includes "a single representative who may be *** the spouse, parent, child[,] or sibling" of the named victim, "except where the spouse, parent, child[,] or sibling is also the defendant." 725 ILCS 120/3(a) (West 2008); 730 ILCS 5/3-1-2(n) (West 2008). The defendant maintains that because this statutory definition of "victim" does not include "grandparent," the trial court "lacked statutory authority to order the defendant to pay restitution to S.G.'s grandfather." As the State notes, however, the statutory provision that defines "victim" for purposes of the restitution statute provides that its terms are to be given their stated meanings "unless the context clearly requires otherwise." 725 ILCS 120/3 (West 2008). The term "victim" can thus be interpreted broadly, particularly where a literal, restrictive interpretation would lead to an absurd or unjust result. See *People v. Lowe*, 153 Ill. 2d 195, 200-03 (1992). We also note that "[l]egislative use of the word 'may' is generally regarded as indicating a permissive or directory reading, whereas use of the word 'shall' is generally considered to express a mandatory reading." *People v. Reed*, 177 Ill. 2d 389, 393

(1997).

With these principles in mind, we agree with the State's contention that to hold that S.G.'s grandfather is not entitled to receive restitution under the facts of this case would "result in absurdity." S.G.'s mother, Rebecca, relinquished custody of S.G. in 2000, and S.G. has been living under her grandfather's care since her allegations against the defendant arose in 2006. S.G.'s grandfather has thus assumed the role of a parent, and in this context, we believe that he was rightfully treated as the "single representative" referred to in the statutory definition of "victim." 725 ILCS 120/3(a) (West 2008); see also *People v. Thornton*, 286 Ill. App. 3d 624, 634 (1997) (noting that a "victim" for restitution purposes can be "a close relative" of the named victim).

Under the circumstances, we conclude that the trial court did not err in ordering the defendant to pay restitution to S.G.'s grandfather. The restitution statute is meant "to make defendants pay any costs incurred as a result of their actions" (*People v. Harris*, 319 Ill. App. 3d 534, 536 (2001)), and its terms "should be construed broadly to effect [its] remedial purpose" (*People v. Fontana*, 251 Ill. App. 3d 694, 707 (1993)). As for the defendant's argument that the trial court's restitution order should be set aside because the court failed to consider his ability to pay restitution and failed to specify, *inter alia*, a payment schedule, these objections have been forfeited by the defendant's failure to raise them at his sentencing hearing. See *People v. Eades*, 123 Ill. App. 3d 113, 118-19 (1984).

CONCLUSION

For the foregoing reasons, the defendant's convictions and sentence are hereby affirmed.


Affirmed.

15

NO. 5-09-0238

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellee, | ) Christian County. |
| | ) |
| v. | ) No. 06-CF-63 |
| | ) |
| JOHN L. GRAHAM, JR., | ) Honorable |
| | ) Ronald D. Spears, |
| Defendant-Appellant. | ) Judge, presiding. |

**Rule 23 Order Filed**:        December 15, 2010
**Motion to Publish Granted**:   January 11, 2011
**Opinion Filed**:              January 11, 2011

---

**Justices**:         Honorable James M. Wexstten, J.

Honorable Richard P. Goldenhersh, J., and
Honorable James K. Donovan, J.,
Concur

---

**Attorneys for Appellant**     Michael J. Pelletier, State Appellate Defender, Johannah B. Weber, Deputy Defender, John H. Gleason, Assistant Appellate Defender, Office of the State Appellate Defender, 117 N. Tenth Street, Suite 300, Mt. Vernon, IL 62864

---

**Attorneys for Appellee**     Hon. Tom Finks, State's Attorney, Christian County Courthouse, 101 South Main Street, Taylorville, IL 62568; Patrick Delfino, Director, Stephen E. Norris, Deputy Director, Patrick D. Daly, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, Fifth District Office, 730 E. Illinois Hwy 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864