2018 IL App (4th) 160035
NO. 4-16-0035

FILED
December 3, 2018
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| LARRY D. HAYDEN, | ) | No. 15CF935 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Presiding Justice Harris concurred in the judgment and opinion.
Justice Steigmann dissented, with opinion.

**OPINION**

¶ 1        A jury found defendant, Larry D. Hayden, guilty of two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014); 720 ILCS 5/11-1.40(a)(1) (West 2012)), and the trial court sentenced him to natural-life imprisonment. Defendant appeals, arguing the court committed reversible error by (1) denying his motion for a severance of charges and (2) ruling that certain hearsay statements would be admissible under section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2014)). We agree with the first argument and, consequently, do not reach the second argument. Because of the misjoinder of charges, we reverse the judgment and remand this case for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3                                    A. The Information

¶ 4             The information consisted of five counts.

¶ 5             In counts I, III, and V, the alleged victim was A.C., and each of those counts accused defendant of offending in April 2015. Counts I and V charged him with predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014)), and count III charged him with aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i)).

¶ 6             In counts II and IV, the alleged victim was T.M., and each of those counts accused defendant of offending sometime during the period of January to June 2012. Count II charged him with predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)), and count IV charged him with aggravated criminal sexual abuse (*id.* § 11-1.60(b)).

¶ 7                       B. The State's Motion Pursuant to Section 115-10

¶ 8             On August 12, 2015, pursuant to section 115-10 of the Code, the State moved for a ruling that certain hearsay statements would be admissible in the jury trial, including statements that A.C. and T.M. had made to friends and relatives, as well as digital video disks (DVDs) of A.C. and T.M. being interviewed at the Champaign County Children's Advocacy Center.

¶ 9             On September 3, 2015, after hearing testimony and arguments, the trial court granted the State's section 115-10 motion.

¶ 10                      C. Defendant's Motion to Sever Counts of the Information

¶ 11            On November 16, 2015, immediately before *voir dire*, defendant moved to sever counts I, III, and V from counts II and IV and to have separate trials on those two groups of charges. "The [i]nformation allege[d] two separate and distinct incidents against two separate

and distinct individuals," defendant argued, and "[i]f the trial were to proceed with all counts, the mere fact that [he was] accused of two separate sexual acts with two separate and distinct individuals [would] lead the jury to improperly and unconstitutionally use this information against [him]."

¶ 12        Without explanation, the trial court denied the motion for a severance.

¶ 13                          D. The Jury Trial

¶ 14        The jury trial occurred on November 17 and 18, 2015. The witnesses testified substantially as follows.

¶ 15                          1. *The Testimony of A.C.*

¶ 16        A.C. testified that she was 12 years old and lived in Rantoul, Illinois, two doors down from D.O., who was a close friend of hers. A.C. knew defendant because he was a friend of D.O.'s father, Leroy P. Before spring break in 2015, A.C. had nothing against defendant except that she did not like his "staring at [her] and stuff."

¶ 17        Spring break was from April 6 to 10, 2015, and sometime during that four-day period, A.C. and her little brother, Joshua, were at D.O.'s house for a sleepover. It was late in the evening, and A.C. and D.O. were in the living room, watching television with Leroy and defendant. D.O. was sitting on a recliner, and A.C. and defendant were sitting on a couch. Leroy was in and out of the living room, doing something or other. D.O. fell asleep on the recliner, and A.C. lay down on her stomach, on the couch, with her feet toward defendant and her head on a pillow. While Leroy was out of the living room and D.O. was asleep on the recliner, defendant began touching A.C. beneath her clothes. He put his hand under her pants, moved up toward her vagina (which she called, in the trial, her "middle part") and digitally penetrated her. When Leroy could be heard "walking around," defendant withdrew and desisted. A.C. got off the

couch, went to the recliner, awakened D.O., and asked her to come upstairs so she could tell her something.

¶ 18        As A.C. and D.O. climbed the stairs, defendant approached A.C. and "started touching [her] on [her] breasts." A.C. "told him to stop and leave [her] alone." He asked her where she was going. She replied that she was going upstairs.

¶ 19        A.C. and D.O. went into D.O.'s bedroom, upstairs, and D.O. was "fixing to l[ie] back down and go back to sleep," but A.C. began weeping and told her that defendant "had touched [her]." A.C. suggested that they tell Leroy, but then A.C. expressed reluctance to tell Leroy, saying she was scared. They decided, instead, to tell D.O.'s mother, Irene O.

¶ 20        They went into Irene's bedroom, which likewise was upstairs, and they awakened her. She got out of bed and sat down in a chair. A "sad look" came over her face when she heard what had happened. A.C. began weeping again and told D.O. they really ought to tell Leroy, too.

¶ 21        A.C. and D.O. went downstairs and asked Leroy to come upstairs with them so they could tell him something. Defendant followed Leroy upstairs, although no one asked him to come along. A.C., D.O., and Leroy went into D.O.'s bedroom, and D.O. closed the door on defendant. When Leroy—who had been drinking vodka—heard what had happened, he was "furious" and began "stuttering."

¶ 22        At some point, while they were upstairs (it is unclear specifically where upstairs), defendant put his hands on A.C.'s knees and apologized. A.C. testified, "He was like[,] 'I'm sorry if I touched you in any kind of way.' " A.C. began weeping again and told him to get off her and leave her alone.

¶ 23        Then everyone went downstairs except Irene, who remained in her bedroom. Leroy was yelling and cursing at A.C., "saying how *** a grown man shouldn't be touching a

little girl." A.C. said she wanted to go home, but Leroy forbade her to leave. He yelled at defendant, too, telling him "he shouldn't be touching a little girl, he ha[d] a wife, and all of that stuff." He told defendant to go home and that their friendship was over—although, A.C. testified, they afterward "remain[ed] good friends" and "still hung out."

¶ 24        In the morning, while D.O. was still asleep, A.C. went downstairs to make herself some breakfast. Leroy "was sitting in that chair," and he had a sad look on his face. A.C. sat down on the couch. Leroy warned her that "if [she] told, there would be major consequences, and like bad things would happen"—"charges and stuff." He never asked A.C. not to tell. He just said there "would be major consequences" and that "[it was her] choice whether to tell or not."

¶ 25        A.C. lived with her grandmother, Cassandra C., who had adopted both her and Joshua. A.C. testified she was scared to tell Cassandra what defendant had done to her because she did not know how Cassandra or her other family members would react. Also, she was scared of defendant. He had never made any threat. Even so, she had "watch[ed] a lot of movies," and she was worried he would threaten or harm Cassandra "or do something bad." So, she did not tell Cassandra upon returning home the morning after the sleepover.

¶ 26        Instead, the persons in whom A.C. confided initially were (besides D.O. and her household) three of her cousins and another close friend of hers, T.M., who was defendant's stepdaughter. One of the cousins was DJ. She told her cousins that same month, April 2015.

¶ 27        A.C. told T.M. in early June 2015. At the time, she had T.M. and D.O. over at her house (which is to say, Cassandra's house), and the three of them were playing in the yard. A.C. testified:

"A. *** So I just happenly [*sic*] brung it up and told [T.M.], because [T.M.] told me that it happened to her; so I just brung it up, and told her what happened.

Q. [T.M.] told you what?

A. [T.M.] told me that it happened to her, [to Kh.], and [to] her little cousin.

Q. And you told her that it happened to you?

A. Yes.

Q. Did you guys give a lot of details back and forth, or [did] you just say, ['H]ey, this has happened to both of us?[']

A. We gave details.

Q. [S]o[,] now you know about [T.M.] Was [D.O.] there?

A. Yes.

Q. Did you guys talk with [D.O.] also?

A. Yes.

Q. You told her, too?

A. Yep.

Q. But still you don't tell any adults yet?

A. Nope."

¶ 28 It was not until June 14, 2015, that A.C. revealed to Cassandra what had happened a couple of months earlier, during spring break at the sleepover at D.O.'s house. The following circumstances caused the subject to come up.

¶ 29    A.C., D.O., and some other kids were walking in the street, heading to A.C.'s house. Defendant was standing in the doorway of Leroy's house, and he told D.O. to get out of the street before she got hit by a car. D.O. told defendant to stop talking to her. Defendant came over to Cassandra's house, put his finger in D.O.'s face, and warned her never to disrespect him again. Cassandra heard the commotion and told defendant to "take that over to [D.O.'s] house" and to "get out of here with that stuff." D.O. returned to her house with defendant, who was threatening "to give her a whupping and all that stuff." Eventually, D.O. returned to Cassandra's house, and A.C.'s cousin DJ remarked that "[A.C. had] said that [defendant] was a pedophile." Cassandra asked A.C. why she had called defendant a pedophile. A.C. "told her that [defendant] had touched [her]," and she gave Cassandra "some details about that." Cassandra telephoned some relatives and the police. When the police officers arrived, none of them "talked to [A.C.] in any kind of detail right then."

¶ 30    While "the adults and the police officers [were] all doing their thing," A.C. and the other kids were still outside, playing catch. They decided to walk to "Grandma Meechie's house," which was just around the corner from Cassandra's house. (Grandma Meechie was not A.C.'s biological grandmother, but A.C. called her "Grandma" because she had known her all her life and she was like a grandmother to her.) As A.C. was walking back to Cassandra's house from Grandma Meechie's house with her "aunties," "cousins," and "grandma," she saw T.M. and T.M.'s mother carrying groceries out of their car. A.C. testified:

> "A. When I saw [T.M.] and her mom, I went over there to [T.M.] and told
> her to tell her mom what happened to her. And [T.M.], she—at first she was
> trying to play it off, like she didn't know what I was talking about. And then I

brung it up, and then she was like, 'Okay, I'll tell my mom.' So[,] she told her mom what happened.

Q. Did you end up talking to her loud or anything, yelling at her, or anything like that?

A. No.

Q. You were just telling her she's got to say?

A. Yeah.

Q. All right. And what happens next?

A. So[,] [T.M.] was telling her mom, and then her mom just started crying."

¶ 31 The next morning, A.C. went to the Children's Advocacy Center, where she recounted to Mary Bunyard what happened at D.O.'s house in April 2015, during spring break.

¶ 32 On cross-examination, defense counsel asked A.C.:

"Q. *** [W]ere you the first one to tell [T.M.] about what had happened, or did [T.M.] tell you first about what had happened to her?

A. She told me what happened to her first.

Q. Okay. And then[,] after that[,] you told her what had happened to you?

A. Yes.

Q. Okay. And [D.O.] was present during all of these conversations; is that right?

A. Yes."

¶ 33 On redirect examination, the prosecutor asked A.C.:

"Q. Has anybody tried to get you to say anything that wasn't?

A. No, no.

Q. Did they put you up to this?

A. No.

[Prosecutor]: No other questions.

[A.C.]: All my grandma told me is to tell the truth and don't lie about anything."

¶ 34                            2. *The Testimony of Irene O.*

¶ 35        Irene O. testified she lived with her friend, Leroy P., and that D.O., age 14, was her daughter. She recalled that, in April 2015, D.O.'s friend A.C. spent the night at her house. She was asleep in her bedroom when the girls came upstairs and woke her.

¶ 36        The prosecutor asked Irene:

"Q. Could you tell us what happens when the girls come to see you?

A. They told me—[A.C.] told me that [defendant] touched her, and I told them to go get Leroy, because I could do nothing.

Q. Why couldn't you do [']nothing[']?

A. I'm in a wheelchair, what you want me to do?

Q. All right. When they talked to you about that, what was their attitude? What was their demeanor? How were they acting?

A. She was crying.

Q. Who is 'she'?

A. [A.C.]

Q. Do you recall exactly what she told you?

A. No.

Q. Do you recall generally what she told you?

A. Yeah—

Q. [—][g]enerally—

A.—that he touched her.

Q. You told them to go find—

A. [—]Leroy."

¶ 37 Although Irene used a wheelchair, she had some ability to walk, and after a while she came downstairs, leaning on the railing. She saw Leroy sitting and talking with A.C., just the two of them, and "[h]e was crying."

¶ 38 On cross-examination, Irene testified she did not hear the conversation between Leroy and A.C. nor did she hear any screaming that night, but it was a big house, and in her bedroom upstairs, she did not think she would have been able to hear any screaming from the living room. After the incident, both defendant and A.C. continued to come over to her house, and sometimes both of them were in the house at the same time. Also, it was her impression that Leroy and defendant continued to be friends.

¶ 39 Defense counsel asked Irene:

"Q. Did you ever hear [defendant] apologize to [A.C.] about this?

A. No.

Q. Did you ever hear [defendant] admit that he did this?

A. Yes.

Q. When?

A. I was at the kitchen table.

Q. And this was the same night?

A. And he said that he did it.

Q. Okay. Did you tell the police that?

A. No, they didn't ask me. You just asked me, I told you."

¶ 40        Defense counsel then impeached Irene with testimony she gave on September 3, 2015, in the section 115-10 hearing. Defense counsel asked her:

"Q. [D]id I ask you if there were later conversations at the house with [defendant] and everybody else at that hearing?

A. I don't remember.

Q. Did you answer yes to that question?

A. I'll say it. I don't remember it.

Q. Did I ask you if you were present for the later conversations and you replied no?

A. I don't remember that.

Q. Did I ask you if your husband was primarily there for the later conversations and you said yes?

A. I don't remember that."

¶ 41                          3. *The Testimony of Leroy P.*

¶ 42        Leroy P. testified that he and defendant formerly were good friends and that defendant used to be at his house all the time—he was a "regular." Defendant was at the house one night in April 2015. Leroy's daughter, D.O., had her friend, A.C., over too, since school was out for spring break. They all were in the living room, and the television was on. Leroy did not believe he was in the living room every moment that night. He could not specifically remember what he did other than watching television in the living room, but he assumed that the only other

- 11 -

thing that could have claimed his attention was the laundry in the basement. Both Leroy and defendant were drinking vodka that night. Leroy admitted he should not have been drinking, considering that he recently had been released from the hospital and was still on medication at that time, but he testified he had no more than two vodkas.

¶ 43    That night, A.C. and D.O. came to him, and the two girls looked somber. A.C. asked if she could speak with him in private. He accompanied the two girls upstairs. He denied seeing defendant touch A.C.'s breasts as they ascended the stairs. They went into Irene's bedroom and closed the door. A.C., who looked nervous, told Leroy that defendant had touched her on the upper portion of her body. At that time, A.C. said nothing to Leroy about being touched on the lower portion of her body. Leroy remarked to her that this allegation could have serious "altercations," and he asked her if it was possible that defendant had intended merely to shake her awake. She denied this was possible, and she assured him she would never lie about something like this.

¶ 44    Leroy testified:

"A. Well, that night, prior to going back downstairs[,] [defendant] was standing there at the door, you know, which was upstairs. And I kind of looked at him like, you know, what are you—what are you—he had no business up there. And but he had the door open[,] and he was looking in there. But I didn't really say anything, I just give him the kind of look like, you know, ['W]hat are you doing up here,['] you know?"

¶ 45    Leroy denied screaming at A.C., defendant, or anyone that night. He denied raising his voice. He denied forbidding A.C. to go home. He denied seeing defendant place his hands on A.C.'s knees and beg her forgiveness. He just asked defendant, when they returned

downstairs, ['D]id you really touch this kid?['] and Irene asked defendant the same question. "He just denied it." Leroy was unaware that Irene had any further conversation with defendant on this subject. Ultimately, Leroy "kind of left it up to [A.C.] to tell her parents or whatever."

¶ 46 Before the incident, Leroy never noticed that A.C. and defendant were on bad terms. After the incident, defendant continued to come over to Leroy's house, and A.C. continued to come over, too.

¶ 47 To Leroy's knowledge, nothing further happened until June 2015. That was when D.O. and defendant got into an altercation because D.O. disrespected defendant when he ordered her to get out of the street. Looking out of a window of his house, Leroy watched defendant as he confronted D.O. at Cassandra's house, and defendant became "very rough" in his words and demeanor toward D.O. Defendant then came to Leroy and complained. Leroy told him to "do the adult thing."

¶ 48 Soon afterward, a man, one of Cassandra's friends, came over to Leroy's yard and punched defendant in the face, knocking his glasses off and causing his cell phone to fall out of his hand and break. Afterward, defendant got in his car and left for Kankakee, Illinois, and Leroy never saw him again.

¶ 49 After the police arrived, Leroy heard from A.C., for the first time, that defendant had touched her all over her body—"top part of her body, lower parts, the whole nine yards." That was news to him. He then told defendant on the telephone that their friendship was over and that defendant no longer was welcome in his house.

¶ 50                    4. *The Testimony of Cassandra C.*

¶ 51 Cassandra C. testified that in April 2015, during spring break, A.C. and eight-year-old Joshua—her grandchildren, whom she had adopted—spent the night at D.O.'s house.

D.O. lived with her parents, Leroy and Irene, a couple of doors down from Cassandra's house. The next morning, A.C. and Joshua returned home. Neither of them mentioned that anything bad had happened at D.O.'s house or that there had been any dispute.

¶ 52 It was not until June 14, 2015, that Cassandra learned something had happened. The circumstance leading to the revelation was a dispute between D.O. and defendant that erupted at Cassandra's doorstep. She told defendant to take the commotion elsewhere and to go with D.O. to her parents' house to hash out the matter with D.O.'s father. A.C. and some other kids were standing around outside. After defendant and D.O. left, one of the kids, DJ, commented that defendant was a "pedophile." This comment by DJ prompted A.C. to tell Cassandra, " 'Grandma, I got something to tell you.' " A.C. then revealed to Cassandra that during spring break, while A.C. was staying overnight at D.O.'s house, defendant touched her, A.C., "[i]n front of her and her butt," as she was asleep on a couch. A.C. made this disclosure to Cassandra outside, in front of the group of kids. Cassandra then questioned A.C. in private, and A.C. told her essentially the same thing as before. A.C. added that Leroy had asked her not to say anything.

¶ 53 Cassandra went over to Leroy's house and confronted defendant, who "denie[d] everything." She then telephoned the police and several relatives. The police arrived, and they spoke with Cassandra, but they did not want to speak with A.C. They wanted to let the Children's Advocacy Center interview her.

¶ 54 5. *The Testimony of Alice R.*

¶ 55 Alice R. testified that she was a close friend of Cassandra's; she lived around the corner from Cassandra; and she, Alice, was known to the neighborhood kids, including A.C., as "Grandma Meechie."

¶ 56        On June 14, 2015, Cassandra telephoned Alice and asked her to come to her house; she said only that it had to do with A.C. When Alice arrived, Cassandra told her what A.C. had told her. At the time, A.C. was some distance away, talking with D.O. Alice could not hear what they were talking about. When the police arrived, they spoke with Cassandra but not with A.C.; they did not wish to speak with her. While the police spoke with Cassandra, A.C. was kept out of earshot.

¶ 57        Alice did not know defendant. She asked the kids who he was. The kids, including A.C., pointed at defendant, who was at his house, across the street.

¶ 58                        6. *The Testimony of T.M.*

¶ 59        T.M. testified she was 12 years old and in the seventh grade. Her mother was Shirita J., and defendant was her mother's ex-husband, who used to live with them. A.C. and D.O. were close friends of T.M.

¶ 60        One evening in the first half of 2012, when T.M. was nine years old and in third grade, her mother was away at work, and T.M. and her four siblings were home with defendant. T.M. was asleep on the couch, and the television was on, but the screen was blue. She did not remember what she was wearing, but usually she wore pajamas at night. She was awakened by something touching her vagina. She opened her eyes. Defendant was sitting on the couch, and his hand was inside her underwear, and a little bit of his hand was inside her vagina. She pushed his hand away, got off the couch, went into the bathroom, and locked the door.

¶ 61        Defendant never had done anything like that to her before, and he never did anything like that to her afterward. To her knowledge, he never improperly touched any of her siblings.

¶ 62 The Friday before trial, November 13, 2015, T.M. had a conversation with the prosecutor and another person (she testified on direct examination by the prosecutor). In that conversation, T.M. said merely that defendant had touched her vagina—not that he had penetrated her vagina. T.M. explained, in the trial, that she had omitted to mention the penetration because she had been too scared to describe everything that had happened to her. She really had not wanted to be there for that conversation, any more than she wanted to be in the trial.

¶ 63 It was not until June 2015 that T.M. told her mother—or any adult—about the touching. But before telling her mother, T.M. told A.C., after A.C.'s disclosure to T.M. that defendant had touched her. A.C. told T.M. this while A.C., T.M., and D.O. were playing hide-and-seek behind A.C.'s house. In response to A.C.'s revelation to her, T.M. revealed to A.C. that defendant likewise had touched her. T.M. also told D.O. sometime when T.M. was in sixth grade. But T.M. never told any of the other kids in the neighborhood. She never told DJ, A.C.'s 14-year-old cousin.

¶ 64 Later in June 2015, A.C. was out walking with her family and a bunch of other kids, and T.M. was outside talking with her mother, Shirita, when A.C. yelled to T.M., " 'We need to tell your mom[!]' " T.M. did not want to tell her mother about defendant's improper touching, but she gave in to A.C. and allowed A.C. to tell the story. After hearing what A.C. had to say, Shirita sent the group of kids away and took T.M. into her grandmother's house. In private, T.M. told Shirita what defendant had done to her. The next day, Shirita took T.M. to the Children's Advocacy Center.

¶ 65                                   7. *The Testimony of D.O.*

¶ 66        D.O. testified she was 14 years old and that A.C. was a friend of hers and lived a house away from her. In April 2016, A.C. and her little brother, Joshua, were at D.O.'s house for a sleepover. (Joshua, who slept in Leroy's bedroom that night, was not involved in the incident.) Defendant and Leroy were watching a game on TV, in the living room. A.C. was on the couch, defendant was "at the table," and D.O. fell asleep in Leroy's recliner. D.O. was awakened by A.C., who was standing by the recliner and weeping. The two of them went upstairs. As they climbed the stairs, D.O. never saw defendant touch A.C. Upstairs, A.C. told D.O. that defendant had touched her all around her private areas. They then told Irene, who told them to tell Leroy.

¶ 67        D.O. and A.C. went downstairs and told Leroy what had happened. He asked A.C. if she was sure, and A.C. replied that she was. The three of them went upstairs to continue the conversation in D.O.'s bedroom. A.C. repeated her story. Leroy remarked that "there would be consequences, like the law involved." Because it was so late, around midnight, he did not want A.C. to go home.

¶ 68        D.O. testified she was present for a conversation between A.C. and defendant. Defendant told A.C. he was sorry. A.C. replied that she did not want to talk with him. He went back downstairs.

¶ 69        Sometime before the sleepover—D.O. could not remember exactly when—T.M. likewise disclosed to D.O. that defendant had touched her. T.M. told her this "a lot before" the two of them became friends of A.C. and well before the sleepover.

¶ 70        D.O. was present, behind A.C.'s house, when A.C. and T.M. told one another about defendant's touching of them.

¶ 71        In June 2015, D.O. was walking down the street with some other kids. They were on their way from Grandma Meechie's house to A.C.'s house, and defendant ordered them to get off the street. Because D.O. had such a dislike of defendant, she told him not to talk to her. He never had done anything to D.O., but she knew about his touching of T.M. and A.C., and, consequently, she did not like him. Defendant became upset over this response, went into D.O.'s house to complain to Leroy, and then came over to Cassandra's house and confronted D.O. He yelled at her and told her never to talk to him that way again. Cassandra then came outside and sent D.O. and defendant to Leroy's house.

¶ 72        Soon, the police arrived. D.O., A.C., and others were out walking when they saw T.M. and her mother. A.C. urged T.M. to tell her mother what had happened to her.

¶ 73                    8. *The Testimony of Shirita J.*

¶ 74        Shirita J., age 37, had been working two jobs for the past 15 years. For the past six years, she had been working mostly nights. Her night shift began at 11:15 p.m. T.M. is her daughter, and defendant, age 45, was (as of June 25, 2015) her ex-husband. When she worked at nights, her children would be at home with him.

¶ 75        On June 14, 2015, toward the evening, Shirita was at her mother's house. Her mother lived just around the corner from her. Defendant was elsewhere, at home. Shirita was unloading groceries from her car because she planned to have supper at her mother's house. T.M. was helping with the groceries. A.C. and D.O. were out walking with a lot of kids and some adults. A.C. approached Shirita, and D.O. was close behind her.

¶ 76        A.C. told Shirita, " 'I need to talk with you about your husband.' " Shirita said all right. A.C. said, " 'Your husband touched me.' " T.M. was standing in the doorway of Shirita's

mother's house, and A.C. yelled to her, " 'You need to tell your mom[!] You need to tell your mom right now[!]' " Shirita testified:

> "A. She didn't say anything, she just stood there. And then I said, 'Tell me, tell me what?' She said, the same thing happened to [T.M.] And I turned to [T.M.] at this time, I said, 'Is what [A.C.] said, is this true?' She nodded her head yes. And I excused the kids, and I said, 'I need to talk with [T.M.]' "

¶ 77    Shirita took T.M. into the television room of her mother's house, and the two of them had a conversation, in private. T.M. told her that "a few years ago," while Shirita was at work, defendant touched her while she was lying on the couch. She asked T.M. where defendant's hand was:

> "A. [T.M.] said in her pants. I said, 'Is that all?' She said no. I said, 'Well, what else? You need to tell me the whole thing.' And she said in her underwear. I said, 'Anything else you need to tell me?' She said, 'Yes, he put his finger in my vagina.'
>
> Q. She used the word, 'in'?
>
> A. Yes.
>
> Q. Do you remember this?
>
> A. Yes.
>
> Q. This made an impression on you?
>
> A. Yeah."

¶ 78    Shirita had a few minutes to get to work, and she told T.M. to go to bed there at her grandmother's house. Defendant was not there; he was home. The next morning, Shirita got off work an hour early, at 7 a.m.; woke T.M. up; and took her to the Rantoul police station. The

police would not talk with T.M. They wanted her, instead, to be interviewed by the Children's Advocacy Center. A few hours later, Shirita took her there.

¶ 79      After the disclosure by T.M., Shirita had no further contact with defendant. She would not take his calls, and she changed her telephone number. Almost a year earlier, in 2014, she filed a petition for a divorce, not because she suspected defendant of anything at that time but merely because "he wasn't the nicest person"—"he was more of a disciplinarian than what [she] would have liked." Yet, until T.M.'s disclosure, they continued living together, and they underwent pastoral counseling in an attempt to repair their marriage. She had never noticed any change in T.M. that she could distinguish from approaching adolescence. The divorce went into effect on June 25, 2015.

¶ 80                              9. *The Testimony of Mary Bunyard*

¶ 81      On the second day of trial, November 18, 2015, before the jury was brought in, the prosecutor told the trial court that the State intended to present audio-video recordings of Mary Bunyard's interviews of A.C. and T.M. at the Champaign County Children's Advocacy Center. The prosecutor noted for the record, however, that the State had deleted two seconds of A.C.'s interview, in which she had remarked, " '[T]his has happened to me before.' " The prosecutor additionally told the court:

> "MR. LOZAR: Judge, there's also a section about—I think it's about the [11] minute, maybe [9], [11] minute 50 second mark, where the same witness references a comment about [T.M.] having told this happened to cousins before, or friends, or sisters before. I had intended to redact that. Counsel has told me that she wants that to stay in, and I've left it in."

- 20 -

¶ 82    The State then called Bunyard, who testified she was a forensic interviewer for the Champaign County Children's Advocacy Center and that on June 15, 2015, she interviewed A.C. and T.M. She identified two DVDs, labeled People's exhibit Nos. 3 and 4, as audio-video recordings of her interviews of the two girls. The DVDs had her initials on them, enabling her to identify them.

¶ 83    Without objection, People's exhibit Nos. 3 and 4 were admitted in evidence and were played for the jury.

¶ 84    The State rested, and the trial court denied defendant's motion for a directed verdict.

¶ 85                    10. *The Testimony of Justin Bouse*

¶ 86    Justin Bouse (called by the defense) testified that for the past 13 years he had been a police officer for the Rantoul Police Department. He had assisted with the investigation pertaining to A.C.

¶ 87    One of the persons he interviewed in his investigation was T.M.'s mother, Shirita J. She told Bouse that T.M. had told her that defendant touched her "around the vaginal area." Shirita did not say "inside" the vagina.

¶ 88    Also, Bouse interviewed Leroy P., who told him that A.C. had said that defendant "had touched her breasts." Leroy never said that A.C. had told him that defendant "touched her below."

¶ 89    Irene O. told Bouse "she never spoke with [defendant] about [A.C.'s] accusations."

¶ 90 Leroy brought D.O. to the police station so that Bouse could interview her, too. According to D.O., defendant had denied the allegations. D.O. never mentioned to Bouse that defendant had apologized to A.C.

¶ 91 11. *The Testimony of Tyler Johnston*

¶ 92 Tyler Johnston testified he had been a Rantoul police officer for 4½ years and that on June 14, 2015, he interviewed Cassandra C. "in reference to a juvenile telling her guardian that she may have been inappropriately touched by a male." He spoke with Cassandra in her kitchen. He also spoke with defendant, at a separate residence, but he did not mention to him the sexual assault allegations. Defendant told Johnston he had been in a physical altercation with "[t]wo males [who] knew Cassandra." Cassandra had been present during the altercation. The two males no longer were at the scene, and Johnston told defendant and Cassandra to stay away from each other.

¶ 93 II. ANALYSIS

¶ 94 A. The Misjoinder of Charges

¶ 95 A trial court may order that two or more charges be tried together "if the offenses *** could have been joined in a single charge." 725 ILCS 5/114-7 (West 2014). "Two or more offenses may be charged in the same [charging instrument] in a separate count for each offense if the offenses charged *** are based on the same act or on 2 or more acts which are part of the same comprehensive transaction" (*id.* § 111-4(a)), unless joining the separate charges would prejudice the defendant (*id.* § 114-8(a)). Thus, assuming the lack of prejudice to the defense (see *id.*), two or more offenses may be charged in the same charging instrument only if (1) the offenses are based on the same act or (2) the multiple acts are part of the same comprehensive transaction (*id.* § 111-4(a)).

¶ 96　　　　　Case law has developed some factors for determining whether multiple acts are parts of the same comprehensive transaction, including (1) "the proximity in time and location of the offenses," (2) "the identity of evidence needed to demonstrate a link between the offenses," (3) "whether there was a common method in the offenses," and (4) "whether the same or similar evidence would establish the elements of the offenses." *People v. Gapski*, 283 Ill. App. 3d 937, 942 (1996). Those are merely factors, however, and we must not allow them to supplant the statutory language. Our duty is to give effect to the plain and ordinary meaning of the words in the statute. See *People v. Shreffler*, 2015 IL App (4th) 130718, ¶ 18. Under section 111-4(a) of the Code, "[t]wo or more offenses may be charged in the same [charging instrument] in a separate count for each offense if the offenses charged *** are based on the same act or on 2 or more acts which are part of the same comprehensive transaction." 725 ILCS 5/111-4(a) (West 2014).

¶ 97　　　　　In this case, the critical language in section 111-4(a) is "the same comprehensive transaction." *Id.* The plain and ordinary meaning of statutory language can be found in a dictionary. *People v. Perry*, 224 Ill. 2d 312, 330 (2007). Typically, the word "transaction" is used to mean "an exchange or transfer of goods, services, or funds." Merriam-Webster's Collegiate Dictionary 1249 (10th ed. 2000). Less often, the word is used to mean "the carrying on or completion of an action or course of action" (Oxford English Dictionary 387 (2d ed. 1989)) or "an exchange or interaction between people" (New Oxford American Dictionary 1787 (2d ed. 2005)). See also Merriam-Webster's Collegiate Dictionary 1248 (10th ed. 2000) ("a communicative action or activity involving two parties or things that reciprocally affect or influence each other").

¶ 98        Section 111-4(a) uses the term "transaction," in this somewhat unusual way, to mean a course of action or an interaction between people because case law preexisting the statute almost always used the term that way when explaining when separate offenses could be joined in a single charging instrument. See *People v. Fleming*, 121 Ill. App. 2d 97, 102 (1970) ("The comments which accompany [section 111-4(a)] reveal it is intended as substantially a restatement and codification of former Illinois law." (citing Ill. Ann. Stat., ch. 38, ¶ 111-4, Committee Comments, at 238 (Smith-Hurd 1967))).

¶ 99        In *People v. Perrello*, 350 Ill. 231, 235 (1932), for example, the supreme court held: "The charge of two different offenses growing out of the same *transaction* may be embraced in different counts of the same indictment." (Emphasis added.) See also, *e.g.*, *People v. Stingley*, 414 Ill. 398, 402 (1953); *People v. Routson*, 354 Ill. 573, 578-79 (1933). In *Perrello*, the four defendants robbed at gunpoint the Mitchells and their seven houseguests on November 21, 1931. *Perrello*, 350 Ill. at 232. The indictment had multiple counts: count I for the armed robbery of William Mitchell, count II for the armed robbery of Leslie Wheeler, count III for the armed robbery of Ralph J. Hines, and so forth. *Id.* Under the common law, if a charging instrument charged unrelated felonies, the remedy was either to quash the indictment or to compel the State to elect upon which count or counts it would proceed. See *People v. Jones*, 291 Ill. 52, 54 (1919). The defendants in *Perrello* moved for this remedy, and the trial court denied their motions. *Perrello*, 350 Ill. at 234. The supreme court upheld the denial because "offenses growing out of the same transaction [might] be embraced in different counts of the same indictment." *Id.* at 235.

¶ 100        To illustrate why the multiple armed robberies in *Perello* should be regarded as parts of the same transaction, the supreme court recounted the facts and rationale in *Waters v.*

*People*, 104 Ill. 544 (1882). In that case, one count of the indictment charged the defendant with larceny of a horse, and the second count charged him with larceny not only of the horse but also of a buggy and a harness. *Perrello*, 350 Ill. at 235. The defendant argued that the second count "was double and bad for duplicity." *Id.* The supreme court disagreed because there was " 'one united, continuous[,] and indivisible act, consisting of the larceny of one horse, one buggy[,] and one harness' " (*id.*)—that is, the defendant in *Waters* stole all three items at the same time, just as the defendants in *Perrello* robbed all eight people at the same time. " 'Had the horse [in *Waters*] been stolen at one time and the buggy and harness at another, then there would be force in the argument, because there would have been two separate and complete crimes ***.' " *Id.* at 236.

¶ 101        If a defendant completes offenses at different times and against different victims, the offenses probably are not parts of the same transaction unless there was "a concerted plan of action or scheme on the part of defendant that would link the two [offenses]." See *People v. Bricker*, 23 Ill. App. 3d 394, 397 (1974); compare *People v. Daniels*, 35 Ill. App. 3d 791, 798 (1976) (count I, which charged the defendant with armed robbery, and count II, which charged him with subsequently attempting to murder a police officer, described the same comprehensive transaction because although the defendant committed the attempted murder 50 minutes after committing the armed robbery and although the victims in the two counts were different, he committed the attempted murder to avoid being arrested for the armed robbery).

¶ 102        In *Bricker*, to use another example, an indictment charged the defendant with two armed robberies. *Bricker*, 23 Ill. App. 3d at 395. Count I charged him with the armed robbery of a desk clerk at a hotel in Bloomington, Illinois. *Id.* Count II charged the defendant with the armed robbery of an attendant at a gas station several miles south of Bloomington. *Id.* That armed robbery occurred only three hours earlier than the armed robbery of the hotel clerk. *Id.* A

jury found the defendant guilty of the armed robbery of the hotel clerk but not guilty of the armed robbery of the gas station attendant. *Id.* On appeal, the defendant argued the trial court had abused its discretion, and had committed reversible error, by denying his motion to sever the two counts. *Id.* The Fourth District agreed. *Id.* at 397. It reasoned:

> "There is nothing in the record to establish that there was a concerted plan of action or scheme on the part of [the] defendant that would link the two armed robberies. They are separate and independent felonious acts. \*\*\*
>
> \*\*\*
>
> Since the State improperly joined the two charges under section 111-4(a), it is certain that the granting of a severance by the trial court would have been in the best interest of justice. The failure to do so deprived [the] defendant of a fair trial." *Id.*

¶ 103 Thus, if at different times a defendant commits the same type of offense against different victims, a similarity in methodology (such as pointing a gun at a clerk) and a similarity of motive (such as the desire for money) do not make the offenses parts of "the same comprehensive transaction." See 725 ILCS 5/111-4(a) (West 2014). The statutory criterion for alleging, in one charging instrument, multiple offenses based on multiple acts is that the acts are "part[s] of the same comprehensive transaction," or course of action. *Id.* There is no other criterion, and there are no add-ons.

¶ 104 Like the Second District in *People v. Walston*, 386 Ill. App. 3d 598 (2008), we decline to follow cases that would substitute for that statutory criterion any other criteria—such as *modus operandi* (*People v. Lewis*, 269 Ill. App. 3d 523, 529 (1995); see *Walston*, 386 Ill. App. 3d at 606), similarity between the victims (*Lewis*, 269 Ill. App. 3d at 529; *Walston*, 386 Ill. App.

3d at 602), and judicial efficiency (*People v. Patterson*, 245 Ill. App. 3d 586, 589 (1993); see *Walston*, 386 Ill. App. 3d at 602). "That a defendant allegedly committed multiple offenses in the same manner has no bearing on whether the offenses were part of the same comprehensive transaction." *Walston*, 386 Ill. App. 3d at 606. *Modus operandi* is relevant only to identify the perpetrator (*People v. Dupree*, 339 Ill. App. 3d 512, 520 (2003)) or to rebut an innocent-construction defense (*People v. Wilson*, 343 Ill. App. 3d 742, 748 (2003)), not to determine whether multiple acts are parts of the same transaction (*Walston*, 386 Ill. App. 3d at 606). "Whether there is any 'similarity between the victims' may bear on *modus operandi*, but the factor is by itself otherwise irrelevant to whether two events were part of the same comprehensive transaction." *Id.* at 602. Nor does "judicial efficiency [have any] bearing on the controlling issue of whether multiple offenses are part[s] of the same comprehensive transaction so that joinder is appropriate under the statute." *Id.* In short, regardless of what the factor is, it "may be considered in the joinder analysis *** only if it is directed at the target of determining whether multiple offenses are part[s] of a single comprehensive transaction." *Id.* at 607.

¶ 105        Defendant's alleged sexual offense against his stepdaughter, T.M., and his alleged sexual offense against his stepdaughter's friend, A.C., at a different place three years later, are not parts of the same comprehensive transaction. It is logically irrelevant that both victims were female minors (see *id.* at 602) and that he sexually molested them in a similar manner and under similar circumstances (see *id.* at 606). Defendant's alleged offense against T.M. and his alleged offense against A.C. were, on the face of the information, separate transactions (see *Kotter v. People*, 150 Ill. 441, 446 (1894)), and, therefore, the trial court abused its discretion by denying defendant's motion for a severance (see *Bricker*, 23 Ill. App. 3d at 397). The similarity of the

two offenses has no logical tendency to make them a "united, continuous and indivisible act." (Internal quotation marks omitted.) *Perrello*, 350 Ill. at 235.

¶ 106                B. Whether the Error Was Harmless

¶ 107          1. *The Admissibility of Hearsay by "the Victim," Compared With the Inadmissibility of Hearsay by a Propensity Witness*

¶ 108          Because defendants are entitled to a fair trial instead of a perfect trial, an error of which a defendant complains on appeal justifies reversal of the judgment only if the error caused prejudice to the defense. See *People v. Jackson*, 195 Ill. App. 3d 104, 118 (1990).

¶ 109          Defendant argues that the trial court's refusal to sever the charges caused prejudice to him. He reasons as follows. If the charges had been severed as they should have been, section 115-7.3(b) of the Code (725 ILCS 5/115-7.3(b) (West 2014)), which made propensity evidence admissible in prosecutions for predatory criminal sexual assault of a child or aggravated criminal sexual abuse (see *People v. Donoho*, 204 Ill. 2d 159, 170 (2003)), would have allowed T.M. to testify in A.C.'s trial and A.C. to testify in T.M.'s trial. Nevertheless, defendant argues—and here is his crucial point—that T.M. or A.C., as a propensity witness, could have testified to defendant's alleged assault upon her, but her hearsay statements—her out-of-court statements about the assault upon her—would have been inadmissible absent an applicable exception to the hearsay rule (see Ill. R. Evid. 802 (eff. Jan. 1, 2011)), such as the exception for excited utterances (Ill. R. Evid. 803(2) (eff. Apr. 26, 2012)). Thus, defendant argues, the severance of the charges would have resulted in the exclusion of many of the credibility-bolstering hearsay statements that the State presented in his trial.

¶ 110          In other words, defendant traces a causal relationship between the denial of his motion for a severance and the abundance of confirmatory hearsay that was allowed in his trial. He does not question that if the charges has been severed, the State would have had the right to

achieve evidentiary depth in its proof of propensity. Unlike the defendant in *Walston*, defendant does not argue that, in severed trials, he could have successfully objected to the *cumulativeness* of propensity evidence (*cf. Walston*, 386 Ill. App. 3d at 609). Rather, he contends that if the charges had been severed, the State could not have achieved this evidentiary depth at the cost of violating the hearsay rule. The defendant in *Walston* argued that, with a severance, he could have objected to cumulative propensity evidence. See *id.* Defendant makes a wholly different argument; he argues that, with a severance, he could have objected to propensity evidence that was inadmissible because it was hearsay, not because it was cumulative. With the charges erroneously unsevered, both A.M. and T.M. were "the victim[s]" in the prosecution, and, consequently, under section 115-10 (725 ILCS 5/115-10 (West 2014)), hearsay statements regarding sexual assaults upon them were admissible (because the trial court found the conditions in section 115-10(b) (*id.* § 115-10(b)) to be satisfied). But if the charges had been severed, as they should have been, the hearsay exception in section 115-10, as defendant interprets that section, would have applied in A.C.'s case only to hearsay statements regarding sexual assaults upon A.C., and in T.M.'s case only to hearsay statements regarding sexual assaults upon T.M.

¶ 111　　　　Defendant agrees that under section 115-7.3(b) (*id.* § 115-7.3(b)), T.M. could have testified as a propensity witness in A.C.'s case, and A.C. could have testified as a propensity witness in T.M.'s case. But their propensity testimony would have had to be "otherwise admissible under the rules of evidence" (*id.*)—including Illinois Rule of Evidence 802 (eff. Jan. 1, 2011), which provides: "Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Supreme Court, or by statute as provided in Rule 101 [(Ill. R. Evid. 101 (eff. Jan. 1, 2011))]." Thus, if the charges had been severed, T.M., as a propensity

witness, could have testified to what defendant did to her, and A.C., as a propensity witness, could have testified to what defendant did to her; but absent an applicable exception to the hearsay rule, they could not have testified to their out-of-court statements of what defendant did to them. Nor, absent an applicable exception to the hearsay rule, could other witnesses have testified to the propensity witnesses' out-of-court statements of what defendant did to them.

¶ 112 For example, T.M.'s statement to Bunyard would have been inadmissible hearsay in A.C.'s case (defendant contends), and A.C.'s statement to Bunyard would have been inadmissible hearsay in T.M.'s case. The purpose of offering those out-of-court statements would have been to prove their truth, *i.e.*, that defendant really did to T.M. and A.C. what they told Bunyard he did to them. See Ill. R. Evid. 801(c) (eff. Jan. 1, 2011) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Likewise, defendant argues, many of the out-of-court statements that T.M. and A.C., as propensity witnesses, had made to relatives and friends would have been objectionable as hearsay. Although in section 115-7.3 the legislature lifted the ban on propensity evidence in prosecutions for sex offenses, it did not create a new hearsay exception in that section.

¶ 113 To evaluate this argument by defendant, we will begin with the language of subsections (a)(1) and (b) of section 115-7.3 (725 ILCS 5/115-7.3(a)(1), (b) (West 2014)). See *Davis v. Toshiba Machine Co., America*, 186 Ill. 2d 181, 184 (1999). The statute, which went into effect in 1998 (Pub. Act 90-132, § 5 (eff. Jan. 1, 1998)), provides as follows:

"(a) This [s]ection applies to criminal cases in which:

(1) the defendant is accused of predatory criminal sexual assault of a child *** [or] aggravated criminal sexual abuse ***[.]

(b) If the defendant is accused of an offense set forth in paragraph (1) ***
of subsection (a) ***, evidence of the defendant's commission of another offense
or offenses set forth in paragraph (1) *** of subsection (a), *** may be
admissible (if that evidence is otherwise admissible under the rules of evidence)
and may be considered for its bearing on any matter to which it is relevant." 725
ILCS 5/115-7.3(a)(1), (b) (West 2014).

¶ 114　　That the defendant has a propensity to commit sex offenses against children
would be relevant because the defendant's having such a propensity would have some tendency
to make it more probable than it otherwise would be that the defendant committed the charged
sex offense against the alleged child-victim in the present case. See *People v. Gonzalez*, 142 Ill.
2d 481, 487-88 (1991) (defining "[r]elevant evidence" as "evidence having any tendency to
make the existence of a fact that is of consequence to the determination of the action more or less
probable than it would be without the evidence"). The defendant's commission of a sex offense
against another child would tend to increase the probability that the defendant has such a
propensity and, therefore, would tend to increase the probability that the defendant committed
the present alleged offense.

¶ 115　　Under the common law, propensity evidence was inadmissible not because it
lacked probative value but, rather, because it had "too much" probative value. *People v.
Manning*, 182 Ill. 2d 193, 213 (1998). The concern was that the jury would find the defendant
guilty more on the basis of wrongs the defendant had committed in the past than on the basis of
evidence that the defendant committed the present charged offense. *Donoho*, 204 Ill. 2d at 170.
Although it was undeniably true that bad people were more likely than good people to do bad

things, the common law excluded propensity evidence "to protect against the jury convicting a defendant because he or she [was] a bad person deserving punishment." *Id.*

¶ 116 Section 115-7.3 (725 ILCS 5/115-7.3 (West 2014)) lifted this evidentiary exclusion in cases of predatory criminal sexual assault of a child, aggravated criminal sexual abuse, and other listed sex crimes. "[T]he legislature enacted section 115-7.3 to enable courts to admit evidence of other crimes to show [the] defendant's propensity to commit sex offenses if the requirements of section 115-7.3 [were] met." *Donoho*, 204 Ill. 2d at 176.

¶ 117 One of those requirements of section 115-7.3 is that the propensity evidence must be "otherwise admissible under the rules of evidence." 725 ILCS 5/115-7.3(b) (West 2014). Therefore, even though the common law rule against propensity evidence is lifted in prosecutions for the listed sex offenses, there is still a condition of admissibility that no *other* rule of evidence stands in the way of the propensity evidence. If the propensity evidence is, for example, hearsay, there must be an applicable exception to the hearsay rule (see Ill. R. Evid. 802 (eff. Jan. 1, 2011); *People v. Sanchez*, 131 Ill. 2d 417, 423 (1989)), or else the propensity evidence is inadmissible—not because it is propensity evidence but because it fails to be "*otherwise* admissible under the rules of evidence." (Emphasis added.) See 725 ILCS 5/115-7.3(b) (West 2014).

¶ 118 It might be argued that, in severed trials, section 115-10 of the Code (*id.* § 115-10), which went into effect in 1983 (Pub. Act 82-782, § 1 (eff. Jan. 1, 1983)), would have provided the necessary hearsay exception for the out-of-court statements of the propensity witness. Defendant disagrees with such an interpretation of section 115-10. He argues that subsection (a) (725 ILCS 5/115-10(a) (West 2014)) creates a hearsay exception not for the out-of-court statements of *any* victim, but for the out-of-court statements of "*the* victim," which, in

- 32 -

the context of that subsection, can mean only the victim designated in the "prosecution." (Emphasis added.)

¶ 119 Again, any interpretation of a statute must begin, if not also end, with the language of the statute, giving the language its plain and ordinary meaning. *Davis*, 186 Ill. 2d at 184. Section 115-10(a) reads as follows:

"(a) In a prosecution for a physical or sexual act perpetrated upon or against a child under the age of 13, or a person who was a moderately, severely, or profoundly intellectually disabled person as defined in this Code *** the following evidence shall be admitted as an exception to the hearsay rule:

(1) testimony by the victim of an out[-]of[-]court statement made by the victim that he or she complained of such act to another; and

(2) testimony of an out[-]of[-]court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim." 725 ILCS 5/115-10(a) (West 2014).

¶ 120 For three reasons, we agree with defendant that interpreting the quoted statute as applying to out-of-court statements by propensity witnesses would be a misinterpretation, lacking any basis in legislative intent.

¶ 121 First, subsection (a)(1) refers to "testimony by *the victim* of an out[-]of[-]court statement made by *the victim*." (Emphases added.) *Id.* § 115-10(a)(1). Likewise, subsection (a)(2) refers to "testimony of an out[-]of[-]court statement made by *the victim*." (Emphasis added.) *Id.* § 115-10(a)(2). "[T]he victim" is part of a sentence and must be interpreted in the

- 33 -

context of the immediately preceding language in the sentence. "[T]he victim" can mean only the victim (or the victims (see *id.* § 102-3) named in the "prosecution for a physical or sexual act" (*id.* § 115-10(a))—not a propensity witness. When the legislature means propensity witnesses, it naturally uses the term "witnesses," not "victims." See *id.* § 115-7.3(d). "[*T*]*he* victim" (emphasis added) (*id.* § 115-10(a)(1), (2)), with the definite article, signifies a particular victim, the one named in the "prosecution" (*id.* § 115-10(a)).

¶ 122  Like all the other words in a statute, the articles count. "If possible, the court must give effect to *every word*, clause, and sentence; it must not read a statute so as to render *any part* inoperative, superfluous, or insignificant ***." (Emphases added.) *People v. Ellis*, 199 Ill. 2d 28, 39 (2002). The articles in a statutory text—the definite articles and the indefinite articles— should not be overlooked or discounted. They are meaningful. We should treat them as chosen by design. Regardless of whether a definite article modifies a singular noun or a plural noun ("the victim" or "the victims"), the definite article has a *particularizing effect*.

¶ 123  The appellate court has explained:

  " 'The' is a restrictive term; it indicates that 'a following noun or noun equivalent refers to someone or something previously mentioned or clearly understood from the context or the situation.' Webster's Third New International Dictionary 2368 (1986). Thus, a principle of statutory construction is that 'the definite article "the" particularizes the subject which it precedes. *It is a word of limitation as opposed to the indefinite or generalizing force of "a" or "an." ' (Emphasis added.) Brooks v. Zabka*, 168 Colo. 265, 269, 450 P.2d 653, 655 (1969) (also holding that ordinance's use of term 'the tax levy' showed that legislature intended to refer to specific type of tax levy and not any tax levy); see also *Stephan v. Pennsylvania*

*General Insurance Co.*, 224 Conn. 758, 764, 621 A.2d 258, 261 (1993) (applying same principle to construction of insurance policy and holding that exclusion's use of term 'the bodily injury,' instead of 'a bodily injury' or 'any bodily injury,' limited exclusion to specific type of bodily injury)." *Sibenaller v. Milschewski*, 379 Ill. App. 3d 717, 722 (2008).

¶ 124 Thus, the definite article in "the victim" (725 ILCS 5/115-10(a)(1), (2) (West 2014)) is a restrictive word, signifying that "victim" is someone previously mentioned in subsection (a) (*id.* § 115-10(a)), namely, the "child under the age of 13," or "person who was a moderately, severely, or profoundly intellectually disabled person" who is the alleged victim in the "prosecution for a physical or sexual act." "[T]he victim" means not just *any* victim but "*the* victim" named in the prosecution. (Emphasis added.) *Id.* § 115-10(a)(1), (2). Interpreting "the victim" in section 115-10 as including a propensity witness would require a decontextualization in defiance of the definite article.

¶ 125 Second, interpreting "the victim" to include propensity witnesses would make subsection (a)(2) appear irrational or inexplicable—another sign that such an interpretation would be incorrect. Subsection (a)(2) creates a hearsay exception for "testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim." *Id.* § 115-10(a)(2). That subsection, as written, makes sense only if "the victim" is the victim named in the prosecution. Typically, a propensity witness would not have made a "complaint of such act or matter or detail pertaining to any act which is an element of an offense." *Id.* And it would be illogical to require that the propensity witness had done so.

¶ 126        Third, considering that it was not until 1997 when the legislature passed section 115-7.3, which made propensity evidence admissible in sex-offense cases (Pub. Act 90-132 (eff. Jan. 1, 1998) (adding 725 ILCS 5/115-7.3)), the legislature could not have intended almost 15 years earlier, by amending section 115-10 (Pub. Act 82-782 (eff. Jan. 1, 1983) (adding Ill. Rev. Stat., ch. 38, ¶ 115-9 (renumbered to 115-10 February 11, 1983)), to create a hearsay exception for propensity evidence in sex offense cases. Propensity evidence—hearsay or not—was not even admissible yet. See *People v. Adams*, 109 Ill. 2d 102, 121 (1985) ("Evidence of collateral crimes, *i.e.*, crimes for which the defendant is not on trial, is inadmissible if relevant merely to establish the defendant's propensity to commit crimes." (Internal quotation marks omitted.)). It is unlikely that by passing section 115-10, the legislature intended to lift the hearsay exception on propensity evidence that nevertheless would have remained inadmissible because it was propensity evidence. "The cardinal rule of statutory interpretation, to which all other rules are subordinate, is to ascertain and give effect to the intention of the legislature" (*Paszkowski v. Metropolitan Water Reclamation District of Greater Chicago*, 213 Ill. 2d 1, 6 (2004)), and "[s]tatutes are to be construed as they were intended to be construed when they were passed" (internal quotation marks omitted) (*JPMorgan Chase Bank, N.A. v. Earth Foods, Inc.*, 238 Ill. 2d 455, 462 (2010)). See also *Sayles v. Thompson*, 99 Ill. 2d 122, 125 (1983) ("The meaning of a statute *** depends upon the intent of the drafters at the time of its adoption, and it is a long-standing principle of statutory construction that it is the court's duty to ascertain and effectuate that intent."). By passing section 115-7.3, the legislature could not have retroactively changed the intent it had when passing section 115-10.

¶ 127        2. *Possible Harm Inflicted on the Defense by the Bolstering Hearsay,*
             *Which Would Have Been Inadmissible if the Charges Had Been Severed*

¶ 128        It is true that section 115-10(a) of the Code would have made *some* hearsay statements admissible in the severed trials—but not hearsay statements by just *any* child victimized by a sexual act; rather, only hearsay statements by "*the* victim" (emphasis added) (see 725 ILCS 5/115-10(a)(1), (2) (West 2014)), meaning the victim to whom the "prosecution" pertains (see *id.* § 115-10(a)). As defendant convincingly argues, the misjoinder of counts I, III, and V with counts II and IV made A.C. and T.M. both "*the* victim" for purposes of section 115-10(a)(1) and (2), and, consequently, threw the doors open to a lot of bolstering hearsay evidence that would have been inadmissible if the charges had been severed, as they should have been. (Emphasis added.) See *id.*

¶ 129        For example, in A.C.'s trial, she could not have testified to what T.M. had told her. Nor could D.O. have testified to what T.M. had told her. Nor could Shirita have testified to what T.M. had told her. Nor could Bunyard have testified to what T.M. had told her. Nor could the DVD of her interview of T.M. been played to the jury. In T.M.'s trial, maybe, under the hearsay exception for excited utterances (see Ill. R. Evid. 803(2) (eff. Apr. 26, 2012)), A.C.'s hearsay statements to D.O. and D.O.'s parents would have been admissible, assuming that such evidence was not unduly cumulative (see *People v. Smith*, 406 Ill. App. 3d 747, 756 (2010)). However, Cassandra could not have testified to what A.C. had told her. Nor could T.M. have testified to what A.C. had told her. Nor could the DVD of Bunyard's interview of A.C. have been played to the jury.

¶ 130        Having taken the trouble to adduce this large amount of hearsay evidence at trial, the State is hardly in a position to wave it off now as unimportant. We can readily infer that all this hearsay evidence was calculated to bolster the credibility of A.C. and T.M.—and defendant

has a reasonable argument that their credibility needed such bolstering. Not only was there a lack of physical evidence, but not every reasonable person would have to believe A.C. and T.M. According to A.C.'s testimony, defendant touched her on the breasts as she was approaching or climbing the stairs. And yet neither Leroy nor D.O., who accompanied her up the stairs, saw defendant do so. According to A.C.'s testimony, defendant penetrated her vagina with his hand. According to Leroy's testimony, however, A.C. complained to him only that defendant had touched her upper body. A.C. told Cassandra C. that defendant touched her on the bottom, but in her testimony in the trial, A.C. did not say he did so.

¶ 131    As for T.M., in a conversation with the prosecutor a few days before the trial, she stated only that defendant had touched her vagina, not that he had penetrated her vagina. In the trial, she changed her story to add penetration.

¶ 132    The victims were close friends, who made almost identical accusations. There were significant inconsistencies between the various stories the victims told. For example, A.C. testified that T.M. told her first, whereas T.M. testified that A.C. told her first.

¶ 133    One could get the impression that defendant had an abrasive personality, which, perhaps, did not endear him to the neighborhood. In some accounts in the trial transcript, he comes across as a disciplinarian. So, there could have been a preexisting bias or antipathy against him. The victims made their accusations to adults only after defendant got in their best friend D.O.'s face. When interviewed by Bouse, D.O. never mentioned to him that defendant had apologized to A.C.

¶ 134    The cumulative, bolstering hearsay statements could have persuaded the jury to overlook those arguable weaknesses and inconsistencies in the State's case and to set aside any questions about the complainants' credibility. The prejudice from the misjoinder of the charges

was the admission of hearsay that, but for the misjoinder, would have been inadmissible. As the Fourth District held in *People v. Bridgewater*, 259 Ill. App. 3d 344, 349 (1994), "[w]hen the trial court has erroneously admitted a hearsay statement, a reversal is mandatory unless it is clearly shown that the error was not prejudicial." In support of that holding, *Bridgewater* cited, among other authorities, *People v. Lawler*, 142 Ill. 2d 548, 562 (1991).

¶ 135          In *Lawler*, a jury found the defendant guilty of the aggravated criminal sexual assault of a 21-year-old woman. *Id.* at 551-52. The issue at trial was whether his sexual intercourse with the complainant had been with her consent. *Id.* at 562. He testified it had been consensual. *Id.* at 555-56. She, on the other hand, testified that he had abducted her and had forced her to have sex with him at gunpoint. *Id.* at 553-54. It was her word against his word. *Id.* at 561-62. To bolster the complainant's testimony, the State presented evidence that with the defendant's permission and his standing nearby and listening, she called her father on a pay phone. By using fictitious names (asking her father if " 'Liz and Dave' " were in) and answering yes and no to his questions, she was able to surreptitiously "let her father know that she was with an armed 'weirdo,' that she was somewhere between Centralia and Mt. Vernon, and that she could not get away." *Id.* at 553. The jury heard testimony from both the complainant and her father regarding this telephone conversation (*id.* at 557), and the supreme court held that the testimony was inadmissible hearsay (*id.* at 561). Further, the supreme court agreed with the appellate court that the error was prejudicial. The supreme court reasoned:

> " 'Where guilt or innocence depends entirely on the credibility of an accuser and the defendant, no error should be permitted to intervene.' [Citation.] Since the crucial question in this case was whether the complainant consented to intercourse with the defendant, the guilt of the defendant hinged entirely on the

credibility of the complainant and himself. When error is shown to exist, a reversal is mandatory, unless it is clearly shown that the error was not prejudicial. [Citation.] Here, the record does not show that the error was harmless ***." *Id.* at 561-62.

¶ 136 Just as *Lawler* was a credibility contest between the defendant and the complainant, so the present case was a credibility contest between defendant and the two complainants, A.C. and T.M. Just as in *Lawler* the State used inadmissible hearsay to bolster the credibility of the complainant, so, in the present case, did the State use what otherwise would have been inadmissible hearsay to bolster the credibility of the complainants—as the misjoinder of the charges allowed the State to do. The record fails to clearly show that the misjoinder of charges and the resulting admission of bolstering hearsay were not prejudicial. See *id.* Although we find sufficient evidence to sustain the convictions, we do not find the "properly admitted evidence" to be "so overwhelming" that it would be impossible for any "fair-minded trier of fact [to] reasonably [acquit]" defendant of the predatory criminal sexual assault of A.C., T.M., or both of them. See *Bridgewater*, 259 Ill. App. 3d at 349.

¶ 137                                III. CONCLUSION

¶ 138 For the foregoing reasons, we reverse the trial court's judgment, and we remand this case for further proceedings consistent with this opinion.

¶ 139 Reversed and remanded.

¶ 140 JUSTICE STEIGMANN, dissenting.

¶ 141 I agree with the majority that (1) the trial court erred by denying defendant's motion for severance and (2) the issue before this court is whether that error was harmless. I also agree with the majority that this issue is one of legislative intent, requiring this court to

determine whether the hearsay statements of a propensity witness are admissible under section 115-10 when that propensity witness is testifying pursuant to section 115-7.3. Because I believe the majority has erred in deeming such statements not admissible, I respectfully dissent and would conclude that the trial court's ruling denying defendant's motion for severance constituted harmless error.

¶ 142      As this dissent will explain in detail, the hearsay statements of a propensity witness should be admissible for three reasons: (1) the case law has interpreted sections 115-7.3 and 115-10 expansively to support the purpose underlying those sections; (2) the legislature did not intend—and could not have intended—section 115-7.3 and 115-10 to exclude the hearsay statements of a propensity witness; and (3) the majority's interpretation of those statutes creates an absurd result by excluding judge-tested hearsay in favor of other hearsay statements that are not subject to being tested by a judge.

¶ 143                    I. MISJOINDER OF CHARGES

¶ 144      Although I have reservations about some of the analysis the majority provides in regarding the misjoinder of charges (*supra* ¶¶ 95-104), I do agree with the majority's ultimate conclusion that defendant's alleged sexual offense against his stepdaughter, T.M., and his alleged sexual offense against his stepdaughter's friend, A.C., at a different place three years later are not part of the same comprehensive transaction (see *supra* ¶ 105). Accordingly, I agree that the trial court erred by denying defendant's motion for severance.

¶ 145      Despite so concluding, I note that a troubling aspect of this case is that defendant literally made his motion for severance immediately before his jury trial began. The trial court's ruling denying that motion was seemingly on the merits, but I can envision a scenario in which a trial court might well deny such a late-filed motion simply on the ground of its being tardy

without reaching its merits at all. A trial court is empowered to control its docket and to enter such pretrial orders that, in the court's judgment and discretion, are necessary for the expeditious processing of cases and trials. See *Sander v. Dow Chemical Co.*, 166 Ill. 2d 48, 65, 651 N.E.2d 1071, 1080 (1995) (a trial court has inherent authority to control its docket so as to prevent undue delays in the disposition of cases caused by abuses of procedural rules); see also *People v. Allen*, 351 Ill. App. 3d 599, 607, 815 N.E.2d 426, 432 (2004) (where this court concluded that a trial court could enforce a plea agreement deadline as long as the court gave advance notice of the deadline).

¶ 146　　　　A trial court may set a deadline for both the State and a defendant regarding the filing of pretrial motions and permit the filing of motions beyond that deadline only for good cause shown. By my agreement that the trial court's denial of defendant's motion for severance in this case was erroneous, I do not wish to be seen as condoning the late filing of such significant motions.

¶ 147　　　　II. THE ADMISSIBILITY OF HEARSAY BY A PROPENSITY WITNESS

¶ 148　　　　　　　　A. The Background of this Case

¶ 149　　　　Defendant argues that the trial court's refusal to sever the charges prejudiced him. The majority correctly states the reasoning of defendant's argument (*supra* ¶¶ 108-12), which I will summarize.

¶ 150　　　　If the charges had been severed, as they should have been, section 115-7.3(b) of the Code (725 ILCS 5/115-7.3(b) (West 2014)), which makes propensity evidence admissible in prosecutions for predatory criminal sexual assault of a child (see *People v. Donoho*, 204 Ill. 2d 159, 170, 788 N.E.2d 707, 714 (2003)), would have allowed T.M. to testify in A.C.'s trial and A.C. to testify in T.M.'s trial. Nevertheless, defendant argues that although T.M. or A.C., as a

propensity witness, could have testified to defendant's alleged assault upon her, her hearsay statements—specifically her out-of-court statements about the assault upon her that the court ruled admissible at trial under section 115-10 of the Code—would have been inadmissible absent an applicable exception to the hearsay rule (see Ill. R. Evid. 802 (eff. Jan. 1, 2011)), such as the exception for excited utterances (Ill. R. Evid. 803(2) (eff. Apr. 26, 2012)). Thus, defendant argues, the severance of the charges would have resulted in the exclusion of many of the credibility-bolstering hearsay statements admitted under section 115-10 of the Code that the State presented in his trial.

¶ 151 In making this argument, defendant concedes that had the trial court properly severed the counts, the State would have moved to admit evidence of the other assault pursuant to section 115-7.3. On this point, defendant's brief states the following:

"This is not speculation—the State filed such a motion upon learning [defendant] sought severance. *** As a preliminary matter, [defendant] concedes that if the trials had been severed, the victim of the non-charged offense likely would have been permitted to testify pursuant to 115-7.3. *** However, 115-7.3 does not permit the kind of evidence which was admitted pursuant to 115-10. ***[A]ll of the hearsay statements of the non-charged victim would not have been admissible."

¶ 152 B. The Language and Purpose of Section 115-7.3

¶ 153 To evaluate defendant's argument, I will begin with the language of section 115-7.3(a)(1), (b) (725 ILCS 5/115-7.3(a)(1), (b) (West 2014)). That statute, which went into effect in 1998 (Pub. Act 90-132, § 5 (eff. Jan. 1, 1998)), provides as follows:

"(a) This [s]ection applies to criminal cases in which:

- 43 -

(1) the defendant is accused of predatory criminal sexual assault of a child *** [or] aggravated criminal sexual abuse ***[.]

\* \* \*

(b) If the defendant is accused of an offense set forth in paragraph (1) *** of subsection (a) ***, evidence of the defendant's commission of another offense or offenses set forth in paragraph (1) *** of subsection (a), *** may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.3(a)(1), (b) (West 2014).

¶ 154    As defendant essentially concedes, evidence that he has a propensity to commit sex offenses against children would be relevant because defendant's having such a propensity would have some tendency to make it more probable than it otherwise would be that the defendant committed the charged sex offense against the alleged child victim in the present case.

¶ 155    C. The Application of Section 115-10 to the Hearsay
Statements of a Propensity Witness

¶ 156    A fundamental part of defendant's argument is that, in severed trials, section 115-10 of the Code (*id.* § 115-10), which went into effect in 1983 (Pub. Act 82-782, § 1 (eff. Jan. 1, 1983)), does not provide the necessary hearsay exception for the out-of-court statements of the propensity witness. Defendant argues that subsection (a) of section 115-10 creates a hearsay exception not for the out-of-court statements of *any* victim but for the out-of-court statements of "*the* victim," which, in the context of that subsection, can mean only the victim designated in the "prosecution." (Emphasis added.) (725 ILCS 5/115-10(a) (West 2014)). The majority finds this argument persuasive, but for the reasons that follow, I do not.

¶ 157                    1. *The Expansive Scope of Section 115-7.3*

¶ 158          I agree with the majority that the issue before us is one of legislative intent. That

is, when considering sections 115-10 and 115-7.3, we need to decide whether those sections

provide for the admissibility under section 115-10 of the hearsay statements of the propensity

witness at defendant's trial for sexual misconduct when the only charges for the jury to resolve

concern the victim of the charged offense. I conclude that the answer is yes and find strong

support for this conclusion in *Walston*, a decision from the Second District Appellate Court that

the majority attempts to distinguish away. *People v. Walston*, 386 Ill. App. 3d 598, 900 N.E.2d

267 (2008).

¶ 159          In *Walston*, which involved a factual context similar to the present case, the

Second District needed to decide how much evidence of the defendant's sexual misconduct with

the propensity witness would be admitted at his jury trial pursuant to section 115-7.3 to show his

propensity to commit such crimes. *Id.* at 611. The Second District answered that question with a

very thoughtful analysis, and how the court began its opinion shows a clear similarity to the case

before us: "[In this case], defendant does not challenge that evidence of both crimes would have

been admissible in either trial; he argues only that less thorough evidence of each crime would

have been admissible in the other trial." *Id.* The *Walston* court also wrote the following, with

which I agree:

> "In a case in which the State seeks to prove propensity, *** the defendant may
>
> very well contest the assertion that he was involved in prior bad acts ***. ***
>
> Thus, in cases under section 115-7.3, *** the State has a compelling reason to
>
> introduce thorough evidence to establish a defendant's propensity. This feature
>
> distinguishes section 115-7.3 cases from typical other-crimes cases, in which

courts labor to avoid a 'trial within a trial' regarding the other-crimes evidence." *Id.* at 613.

¶ 160    I note that in the present case, defense counsel in closing argument disputed the claims of both A.C. and T.M., even though defendant did not testify. Of course, because the State cannot know until it rests whether a defendant is going to testify, the State must be prepared to present all of the probative evidence it possesses in its case-in-chief.

¶ 161    The *Walston* court also noted that, in contrast to the typical case in which a defendant's convictions are being offered for impeachment and therefore such evidence may be limited, "under section 115-7.3, the State's interest in presenting propensity evidence is stronger in light of the statutory invitation to a defendant to challenge the evidence." Further, "the defendant's interest in excluding the evidence is weaker in light of the statutory reversal of the common-law presumption that other-crimes evidence is *per se* unfairly prejudicial." *Id.* at 621.

¶ 162    Interestingly, the *Walston* court also wrote the following:

"We further note that *** defendant here challenged the credibility of the complaining witnesses and thus challenged the other-crimes evidence; defendant's position provided the State further justification to introduce additional evidence of each crime." *Id.* at 623.

¶ 163    Significantly—and, again, similar to the present case—the defendant in *Walston* did not dispute that the testimony of each victim would have been admissible in both trials if the cases had been severed. Instead, "his argument focuses on the additional evidence the State presented regarding each alleged crime." *Id.* at 624. The *Walston* decision then goes on to discuss at length this other testimony, which included testimony from police officers, multiple

nurses, a friend of the victim, a cab driver, and the same doctor who treated both victims. *Id.* at

623-24. The court noted that this supplemental testimony

> "corroborated portions of the victims' testimony by establishing that they bore
>
> injuries consistent with their versions of events, by establishing that they were
>
> upset shortly after the incidents, and by confirming that defendant had been angry
>
> at the bar before allegedly assaulting the second victim. The most salacious of this
>
> evidence—the evidence regarding the injuries and the evidence regarding the
>
> victims' emotional states after the incidents—served the important function of
>
> corroborating the victims' testimony, testimony that defendant challenged or
>
> refuted on several grounds." *Id.* at 625.

¶ 164   The *Walston* court concluded as follows:

> "Given our *expansive interpretation* of the amount of evidence allowed under
>
> section 115-7.3 (and the high level of deference afforded the trial court in making
>
> decisions under section 115-7.3), we do not conclude that the undue prejudice
>
> from the amount of detail contained in this supplemental propensity evidence
>
> outweighed its probative value." (Emphasis added.) *Id.*

¶ 165   In *People v. Bates*, 2018 IL App (4th) 160255, ¶¶ 79, 85, a recent decision of this

court, we discussed *Walston* regarding the defendant's claim that he was prejudiced by the extent

of the propensity witness's testimony introduced pursuant to section 115-7.3. This court rejected

that claim and quoted *Walston* approvingly regarding the scope of evidence admitted under

section 115-7.3, noting that the State " 'has a compelling reason to introduce thorough evidence

to establish a defendant's propensity' " and that section 115-7.3 should be given an " 'expansive

interpretation' regarding the amount of evidence that can be allowed." *Id.* ¶ 85. We also quoted

approvingly *Walston*'s statement that "the danger of unfair prejudice [from a mini-trial] in the context of a section 115-7.3 case, as opposed to a common-law other-crimes case, is greatly diminished." (Internal quotation marks omitted.) *Id.*

¶ 166 Another case that offers some helpful analysis is *People v. Fields*, 2013 IL App (3d) 080829-B, 999 N.E.2d 1 (opinion of McDade, J.), which addresses generally the scope of evidence to be admitted under section 115-7.3 and suggests a broad interpretation thereof. In *Fields*, the court wrote the following:

> "Defendant apparently reads section 115-7.3 to allow only the admission of testimonial evidence, adding the limited term 'testimonial' into section 115-7.3. Not only does the plain language of section 115-7.3 not support defendant's narrow interpretation, Illinois' long-standing definition of 'evidence' refutes it.
>
> 'Evidence' includes all of the means by which alleged facts are proved or disproved. *** It encompasses testimony delivered by witnesses and records, documents, objects, stipulations, and facts judicially noticed or presumed." *Id.* ¶¶ 21-22.

¶ 167 The opinion then concluded as follows: "We find nothing in the definition of 'evidence' or the language of the statute to support defendant's restrictive interpretation of the term 'evidence' as used in section 115-7.3." *Id.* ¶ 24. (I note that this decision was ultimately vacated on other grounds by the supreme court in a supervisory order (*People v. Fields*, No. 117121 (Ill. Mar. 26, 2014)), and the Third District, on remand, did not engage in the same analysis. See *People v. Fields*, 2015 IL App (3d) 080829-C, 27 N.E.3d 704 (opinion of McDade, J.). Nonetheless, I find the Third District's initial analysis helpful and persuasive.)

¶ 168                              2. *The Expansive Scope of Section 115-10*

¶ 169          Another case with some helpful analysis is *People v. Boling*, 2014 IL App (4th) 120634, ¶¶ 83-97, 8 N.E.3d 65, wherein this court explained that section 115-10 should be interpreted *expansively*, consistent with its purpose. Thus, this court wrote that:

> "[U]nder section 115-10(a)(2) of the Code, a 'matter or detail pertaining to any
> act which is an element of an offense' [citation] may include facts about the
> victim's relationship with the defendant if relevant to explain the context within
> which the alleged charged acts occurred. Our analysis is anchored to the purpose
> of section 115-10 of the Code, which is to address the difficulties of eliciting trial
> testimony from a child victim in a prosecution for sex crimes." *Id.* ¶ 87.

¶ 170          The *Boling* court also noted that ancillary facts, which would be relevant and admissible through a victim's direct testimony,

> "may be just as difficult to elicit at trial as the facts directly establishing the
> elements of the charged offense. If the only hearsay statements admissible under
> section 115-10 of the Code had been [the victim's statements about defendant's
> sexual misconduct] (statements *directly* establishing the acts that were elements of
> the charged offenses), the jury would be left with no context from which to assess
> the veracity of those claims." (Emphasis in original.) *Id.* ¶ 90.

¶ 171          Likewise, in *People v. Bowen*, 183 Ill. 2d 103, 115, 699 N.E.2d 577, 584 (1998), the supreme court discussed section 115-10, as follows:

> "[S]ection 115-10 was a needed response to the difficulty of convicting persons
> accused of sexually assaulting children. It is well known that *child witnesses*,
> especially the very young, often lack the cognitive or language skills to

effectively communicate instances of abuse at trial [citation] or may be impeded psychologically in their efforts to do so [citation]. Section 115-10 alleviated such concerns by allowing for detailed corroborative evidence of *the child's* complaint about the incident to another individual." (Emphases added).

¶ 172　　　　　　　　3. *Two Explanatory Hypothetical Scenarios*

¶ 173　 The following two hypothetical scenarios illustrate why this court should not accept defendant's argument in this case.

¶ 174　　　　　　　　　　a. Scenario One

¶ 175　　　　Defendant is on trial for predatory criminal sexual assault of Susie, who is 10 years old. The court grants the State's motion under section 115-10 to admit the statements Susie made about defendant's misconduct to her fourth grade teacher and a social worker who specializes in interviewing child sex victims.

¶ 176　　　　When called to testify at trial, Susie freezes up and is unable on direct examination to describe what defendant did to her.

¶ 177　　　　On cross-examination, defendant's counsel asks a few innocuous questions that Susie answers.

¶ 178　　　　The State then offers her statements under section 115-10 that the court had earlier stated it would admit. Case law makes clear that those statements are admissible despite Susie's inability to answer questions on direct examination.

¶ 179　　　　　　　　　　b. Scenario Two

¶ 180　　　　Defendant is on trial for predatory criminal sexual assault of Anna, who is also 10 years old and a neighbor of Susie.

¶ 181     Defendant was charged with predatory criminal sexual assault of Susie in a separate proceeding—namely, Scenario One—that is not joined with the trial of the charge against defendant regarding Anna. As noted, the trial court grants the State's motion in Scenario One (the case in which Susie is the victim) to admit under section 115-10 the statements Susie made to her fourth grade teacher and a social worker.

¶ 182     Anna testifies at trial about the criminal sexual conduct defendant committed upon her, but she did not make any statements to third parties about that conduct, so the State has no hearsay statements of Anna to offer pursuant to section 115-10. Further, there is no physical evidence to corroborate Anna's allegation, and defendant denies all of those allegations.

¶ 183     Susie is called to testify under section 115-7.3 to strengthen the State's case that defendant committed the predatory criminal sexual assault of Anna by showing his propensity to commit the alleged criminal behavior. However, Susie freezes up at trial and is unable to testify on direct examination regarding what defendant did to her.

¶ 184     When the State seeks to offer Susie's statements under section 115-10 and defendant objects, the argument defendant makes to this court—and that the majority now buys—would require the trial court to sustain the objection, bar Susie's hearsay statements, and (in my judgment) seriously jeopardize what is supposed to be the truth-seeking aspect of that jury trial. In this second hypothetical scenario, when Susie testifies as a propensity witness pursuant to section 115-7.3, I believe the jury should be permitted to hear Susie's section 115-10 statements so that it has all the probative evidence it needs to resolve the case.

¶ 185     Further, given that the issue before us is one of legislative intent, I cannot believe that the legislature, when enacting sections 115-10 and 115-7.3, could ever have intended to keep the jury in Scenario Two from hearing Susie's section 115-10 hearsay statements.

¶ 186          4. *The Legislative Intent Underlying Sections 115-10 and 115-7.3*

¶ 187          The majority gives great emphasis to the term "the victim," as used in section 115-10(a)(1), but the question must be asked: What term other than "the victim" could the legislature even have considered when it enacted section 115-10 in 1983? After all, section 115-7.3, which provides for the admissibility of propensity evidence in sex offense cases, was not enacted until 1998, 15 years later. Further, when section 115-10 was enacted in 1983, the law was settled beyond dispute that propensity evidence was absolutely prohibited. So, of course the legislature referred to "the victim" when enacting section 115-10(a)(1) because there was no other possible witness in a sex offense case any legislator could have envisioned who would similarly be testifying.

¶ 188          However, this situation changed in 1998 when the legislature eliminated the prohibition against propensity evidence in sex offense cases and explicitly provided for the admissibility of such evidence. This enactment, as the *Walston* court explained, reflected a policy determination by the legislature that a jury should receive pertinent information about the sexual misconduct of a defendant when it decides whether he is guilty of the sexual offense for which he is on trial. Surely, this clear legislative intent to broaden the information the jury hears about the defendant is totally inconsistent with the quite restrictive construction on section 115-10(a)(1) that the majority erroneously adopts in this case.

¶ 189          The majority correctly notes that the meaning of a statute depends on the intent of the drafters at the time of its adoption and then writes that "[b]y passing section 115-7.3, the legislature could not have retroactively changed the intent it had when passing section 115-10." *Supra* ¶ 126. The problem with this statement is that it begs the question—namely, it assumes that the legislature had the intent, when it enacted section 115-10, to exclude from its application

hearsay statements by propensity witnesses. As already explained, the legislature had no such intent because no legislator could have foreseen the circumstances 15 years later when the testimony of propensity witnesses would be admissible.

¶ 190　　　　As mentioned earlier, defendant's restrictive interpretation of section 115-10(a)(1) to exclude therefrom the testimony of propensity witnesses who are testifying pursuant to section 115-7.3 rests almost entirely upon the use of the singular term "the victim" in that section when it was enacted in 1983. That is much too thin a reed to support reversing the multiple convictions in this case and to require as a result that these young victims testify yet again.

¶ 191　　　　I also view as significant that although the Code does not define the term "victim," section 102-3 of the Code does state that "[a] singular term *shall* include the plural ***." (Emphasis added.) 725 ILCS 5/102-3 (West 2014). Moreover, when interpreting the definition of "victim" as used in other statutes, courts have given the term a broad meaning. See *People v. Graham*, 406 Ill. App. 3d 1183, 1194, 947 N.E.2d 294, 304 (2011) ("The term 'victim' can thus be interpreted broadly, particularly where a literal, restrictive interpretation would lead to an absurd or unjust result."); *People v. Lowe*, 153 Ill. 2d 195, 201, 606 N.E.2d 1167, 1171 (1992) ("We believe that, within the context of section 5-5-6, the term 'victim' has a broader meaning than that given it in the Act.").

¶ 192　　　　As a last matter, I mention examples of evidence coming from a propensity witness that, according to the majority, would *not* be barred: (1) the propensity witness's prior identification under section 115-12 of the Code, (2) hearsay statements made by the propensity witness to medical personnel for purposes of medical diagnosis or treatment under section 115-13 of the Code, and (3) spontaneous declarations that the propensity witness may have made. An interesting point about the admissibility of all the foregoing evidence in comparison to the

admissibility of the hearsay statements of the propensity witness under section 115-10 is that only the latter need to be subjected to judicial scrutiny before they could be admitted at trial, meaning that a judge must decide whether the time, content, and circumstances of those statements provide sufficient safeguards of reliability. Yet, the majority would bar only these judge-tested, section 115-10 statements.

¶ 193                           III. CONCLUSION

¶ 194          For the reasons stated, I conclude defendant did not suffer any prejudice. Because section 115-10 permits a propensity witness's hearsay statements to be admitted pursuant to that section, the trial court's denial of defendant's motion for severance constituted harmless error.

¶ 195          Accordingly, I respectfully dissent.